## PLANING-MACHINE COMPANY v. KEITH.

1. The action of the Commissioner of Patents in granting letters-patent does not conclude the question whether there was not an abandonment. A person charged with infringing them, may show that before they were issued the patentee had abandoned his invention. The intention to abandon may be manifested otherwise than by words.
2. There may be an abandonment after or before an application for letters has been made and rejected, or withdrawn.
3. An inventor must comply with the statutory conditions. He *cannot without cause* hold his application pending during a long period of years, leaving the public uncertain whether he intends ever to prosecute it.
4. The facts concerning the application for letters-patent No. 138,462 granted to Joseph P. Woodbury April 29, 1873, for an alleged new and useful improvement in planing-machines, stated. It appears among other things that it was rejected and nothing done thereafter for many years; that he meanwhile obtained other letters, and knew that thousands of planing-machines containing his alleged invention were manufactured, sold, and used in the United States. *Held*, that his inaction, delay, and silence for more than six-

teen years were such as encouraged such manufacture and sale of it, and that the circumstances showed his abandonment of it.

5. The rule in the Patent Office, which, previous to the revised patent act of July 8, 1870, provided that "an application rejected, or not prosecuted, within two years after its rejection or withdrawal, should be conclusively presumed to have been abandoned," being at most only a rule of practice adopted by that office and not always enforced, was no bar to a movement by an inventor to have his application reinstated after its withdrawal. He might have filed a new one or applied for a re-examination or appealed; and the existence of the rule is not an adequate excuse for conduct which the court considered as manifesting an abandonment of his invention.

6. The invention of a planing-machine having a solid bed of no particular form, or specified thickness, and not requiring to be constructed in one piece, is anticipated by a machine for cutting and planing light material, having in other respects the same devices and a solid bed adequate for the purposes for which it was intended. The fact that the bed of the latter is divided by a slit running longitudinally from one end to the other, yet arranged so as to constitute one bed, makes no difference. A machine remains the same in principle, although one or all of its constituents be enlarged and strengthened so as to perform heavier work.

7. Section 4920, Revised Statutes, declares that the proofs of previous invention, knowledge, or use of the thing patented, may be given upon notice in the answer of the defendant, stating the names of patentees, the dates of their letters-patent and when granted, and the names and residences of the persons alleged to have invented or to have had the prior knowledge of the thing patented, and where or by whom it had been used. *Held*, that only the names of those who had invented or used the anticipating machine or improvement, and not of those who are to testify touching its invention or use, are required to be set forth.

8. The court, upon the whole case, decides that said Woodbury was not the original and first inventor of the improvement for which he obtained said letters-patent No. 138,462, and that if he was, he had abandoned it to the public before they were issued.

APPEAL from the Circuit Court of the United States for the District of Massachusetts.

The facts are stated in the opinion of the court.

Submitted by *Mr. A. A. Stout, Mr. Charles M. Reed*, and *Mr. J. A. L. Whittier* for the appellants, and by *Mr. B. F. Thurston* and *Mr. David Hall Rice* for the appellee.

MR. JUSTICE STRONG delivered the opinion of the court.

The bill of The Woodbury Patent Planing-Machine Company, the appellant, is founded upon letters-patent granted to Joseph P. Woodbury on the 29th of April, 1873, for an alleged "new and useful improvement in planing-machines," numbered 138,462. The specification declares the object of the improve-

ment to be presenting the material to the cutter in such a manner as both to counteract, as far as practicable, the fluttering or tremor caused by the successive blows of the knives, and the consequent wavy and uneven surface of the planed work, and at the same time to overcome more perfectly than theretofore the tendency in the knives of the rotary cutter to loosen and dislodge the knots and shakes, and to tear the fibres of the wood irregularly, instead of severing them smoothly along the exact surface desired.   To accomplish this two-fold object the patentee proposed to make use of what he denominated " a yielding pressure-bar," made of such material, and of such mass, as to be rigid from end to end, with its under face flat, so that it may have an extended bearing upon the work longitudinally of the machine, and mounted upon springs, so as, within certain limits, to accommodate itself to the varying irregularities in the surface of the material operated upon.   The specification then proceeds to state the patentee's supposed advantages of the alleged invention, and to describe, by reference to drawings, the patented device.   The claims are four, all for combinations.   They are as follows : —

1. The combination of a rotary cutter and a yielding pressure-bar or bars, substantially as and for the purpose described.

2. The combination of a solid bed and a yielding pressure-bar or bars for the purpose of holding down the material while being acted on by the cutter, substantially as set forth.

3. The combination of a solid bed, a rotary cutter, and a yielding pressure-bar or bars, substantially as described.

4. The combination of the two pressure-bars, one of which is supported upon arms, and the other upon springs, substantially as and for the purpose set forth.

It is this use of yielding pressure-bars in the combination which constitutes principally, if not wholly, the novelty of the device described in the patent.   Planing machines with a solid bed, rotary cutter, and devices for receiving and transmitting the power had been known and in use long before Woodbury claimed to have made his invention.   The Woodworth planing machine, substantially the first of the class, had all these in combination, and in the same combination as they are found in the machine to which Woodbury applied his yielding bars, but

instead of bars Woodworth used rollers to keep firmly in position the wood to be planed. Woodbury merely substituted bars for rollers. No doubt the substitution was an improvement. It enabled the pressure upon the wood to be brought nearer to the cutters than it could be in the Woodworth machine. It had a more extended bearing, and, therefore, held the material more steady under the action of the knives or cutters, and the bars, perhaps, were less likely to be clogged by the chips cut in the operation of the machine.

On the 2d of March, 1874, the patentee sold and assigned his letters patent to the complainant, and it brought this suit against the defendant for an alleged infringement.

The answer of the defendant denies any infringement and attacks the validity of the Woodbury patent for several reasons, any one of which, if sustained, must bar the relief which the complainant seeks. It is denied that Woodbury was the first and original inventor of the improvement claimed, and it is averred that the invention described in his patent had been publicly known and used for more than two years before his application for a patent was made, and that before that time his invention had been abandoned to the public. The answer contains other averments, which we think it unnecessary to set forth, because the controlling questions are, whether the device of Woodbury was the first and original invention, and whether, if it was, it was abandoned to the public before he obtained his patent.

Before proceeding to the consideration of the several defences set up, it will be convenient to refer briefly to the history of Woodbury's alleged invention. Though the patent was not granted until 1873, the earliest application for it was made on the 3d of June, 1848. The invention appears to have been completed in the latter part of the year 1846, a caveat for it having been forwarded to the Commissioner of Patents, as early as the 28th of May, of that year. The petition for the patent authorized and empowered J. James Greenough, as attorney for the petitioner, to alter or modify the specification, as he might deem expedient; and also to receive back any moneys which the petitioner might be entitled to withdraw, and to receipt for the same. Greenough, however, was not empowered to withdraw the application.

On the 20th of February, 1849, the application for a patent was rejected in the Patent Office, and no serious attempt appears to have been made to procure a re-examination, or to renew it, for a period of more than twenty years, though, during more than sixteen years of that time, the improved device had been in common use. In October, 1852, Greenough, the applicant's attorney, formally withdrew the application, and received back $20, of which, however, Woodbury had no notice at the time. The attorney had no sufficient authority to withdraw the application, though he had to withdraw the fee. In 1854, five years after the application had been rejected in the office, Woodbury instructed Mr. Cooper, another patent solicitor, who was acting for him in another case, to call up and prosecute anew his rejected application. This, however, was not done. Mr. Cooper, it seems probable, was deterred from taking any action in regard to the matter, by a rule which, at that time, he thought was generally enforced in the Patent Office, viz., that an application rejected, or not prosecuted, within two years after its rejection or withdrawal, should be conclusively presumed to have been abandoned. This rule was not always enforced, and it was reversed by the commissioner in 1869, and in the revised patent act of 1870, Congress enacted: " That when an application for a patent has been rejected or withdrawn, prior to the passage of this act, the applicant shall have six months, from the date of such passage, to renew his application, or to file a new one ; and if he omit to do either, his application shall be held to be abandoned. Upon the hearing of such renewed applications, abandonment shall be considered as a question of fact." It was within six months after the passage of this act that Woodbury renewed his application, upon which the patent was granted.

In view of this history, and of the other facts appearing in the case, the question is a grave one, whether the invention, even if Woodbury was the first inventor, was not abandoned by him before his renewed application was made.

It is quite certain that the action of the commissioner, granting the patent in 1873, is not conclusive of the question whether there had not been an abandonment. Under the 35th section of the act of 1870, abandonment is declared to be a question of

fact. The rule of the Patent Office, though not always adhered to, had held it to be a question of law, in the cases to which it was applied, and the effect of the statute was rather to change the rule, than to make the decision of the commissioner, granting a patent, an unreviewable decision that the invention had not been abandoned. In fact, the commissioner may, not be called upon to pass upon that question. No evidence respecting it may be before him, except mere lapse of time, and he has not generally the means of ascertaining what the action of an applicant for a patent has been, outside of the Patent Office. It surely cannot be claimed that patents obtained under the provisions of the 35th section of the act are any more unimpeachable than those referred to in the 24th section. By that section the commissioner is authorized to deal with the question whether the invention has been abandoned, as well as with the question whether it was in public use or on sale more than two years prior to the application. Yet, both these matters, as well as the originality of the invention, upon which the commissioner must pass, may be contested in suits brought for infringement of the patent. Such defences are allowed by the statute. It must, then, be open to every person, charged with an infringement, to show in his defence that the patentee had abandoned his invention before he obtained his patent.

It has sometimes been said that an invention cannot be held to have been abandoned, unless it was the intention of the inventor to abandon it. But this cannot be understood as meaning that such an intention must be expressed in words. In *Kendall et al* v. *Winsor* (21 How. 322), this Court said, " it is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public, and this he may do either by express declaration or by conduct equally significant with language; such, for instance, as an acquiescence with full knowledge in the use of his invention by others; or he may forfeit his rights as an inventor by a wilful or negligent postponement of his claims." To the same effect is *Shaw* v. *Cooper*, 7 Pet. 292. These were cases, it is true, where the alleged dedication to the public, or abandonment, was before any application for a patent, but it is obvious there may be an abandonment as well after such an application has been made

and rejected, or withdrawn, as before, and evidenced in the same manner. In *Adams* v. *Jones* (1 Fish. Pat. Cas. 527), Mr. Justice Grier said, " a man may justly be treated as having abandoned his application if it be not prosecuted with reasonable diligence. But involuntary delay, not caused by the laches of the applicant, should not work a forfeiture of his rights."

The patent law favors meritorious inventors by conditionally conferring upon them for a limited period exclusive rights to their inventions. But it requires them to be vigilant and active in complying with the statutory conditions. It is not unmindful of possibly intervening rights of the public. The invention must not have been in public use or on sale more than two years before the application for a patent is made, and all applications must be completed and prepared for examination within two years after the petition is filed, unless it be shown to the satisfaction of the commissioner that the delay was unavoidable. All this shows the intention of Congress to require diligence in prosecuting the claims to an exclusive right. An inventor *cannot without cause* hold his application pending during a long period of years, leaving the public uncertain whether he intends ever to prosecute it, and keeping the field of his invention closed against other inventors. It is not unfair to him, after his application for a patent has been rejected, and after he has for many years taken no steps to reinstate it, to renew it, or to appeal, that it should be concluded he has acquiesced in the the rejection and abandoned any intention of prosecuting his claim further. Such a conclusion is in accordance with common observation. Especially is this so when, during those years of his inaction, he saw his invention go into common use, and neither uttered a word of complaint or remonstrance, nor was stimulated by it to a fresh attempt to obtain a patent. When in reliance upon his supine inaction the public has made use of the result of his ingenuity, and has accommodated its business and its machinery to the improvement, it is not unjust to him to hold that he shall be regarded as having assented to the appropriation, or, in other words, as having abandoned the invention.

There may be, it is true, circumstances which will excuse delay in prosecuting an application for a patent, after it has

been rejected, such as extreme poverty of the applicant, or protracted sickness. Of such cases we are not now speaking. None of these ordinary and accepted reasons for Woodbury's inaction during the more than sixteen years that elapsed between 1854 and his presentation of the new petition upon which his patent was granted, are found in this case.

His first application, as we have seen, was rejected on the 20th of February, 1849, and he was then informed from the Patent Office that he could "withdraw or appeal." Nothing, however, was done until Oct. 4, 1852, when his attorney withdrew the application and received back $20. True, the attorney was not empowered to withdraw the application, and it does not appear that Woodbury was then informed it had been withdrawn, but he was informed that the application had been rejected, and he gave no instructions to do anything more in the case, though instructions were asked, and though he was frequently in communication with his attorney, who obtained for him another patent on the 20th of March, 1849. The rejected application was suffered to rest until Feb. 27, 1854, when Woodbury wrote to Mr. Cooper, another attorney, informing him that he had a rejected application, filed in June, 1848, for an improvement in pressure with the rotary cutter, and asking him to call up the case and get a patent for the most he could. Mr. Cooper made application for copies of the drawings and specification and for the letter of rejection, after having been informed that the application for the patent had been withdrawn; but nothing further was done except that Cooper informed Woodbury the application had been withdrawn by his former attorney. Thus the matter rested. Cooper's connection with it ceased in September, 1854. No effort was made in the Patent Office to have the rejected application reinstated, though such an effort must have been successful had it been made, and apparently Woodbury acquiesced alike in the rejection and in the withdrawal, until December, 1870, when his new application was made. During all this time he was in frequent communication with the Patent Office, prosecuting, and successfully, other applications for patents. He was not pressed by poverty to such an extent as to hinder his renewal of his application. This is shown by

direct evidence, and by the fact that he had means to sue for and obtain other patents.  Nor was he unwarned of the danger of delay.  Very soon after 1854, if not before, the use of planing machines containing pressure-bars in combination with rotary cutters and a solid bed, was general.  The defendant's answer asserts that before Dec. 5, 1870, and since the withdrawal of Woodbury's rejected application, many thousand planing machines, containing his invention, had been constructed, sold, and used in the United States, and this assertion is accepted in the appellant's brief.  This fact must have been known by him.  Upon this subject the evidence is very full.  As we have seen, the distinctive element of Woodbury's invention was the substitution of yielding pressure-bars for the rollers employed in the Woodworth patent.  A machine patented to Joseph E. Andrews in 1845 had those pressure-bars, and Woodbury was engaged for years in selling those machines.  Between 1852 and 1854 three Cornell machines of the Woodworth patent, rotary cutter, yielding pressure-bars combined with a solid bed were used by John F. Keating in his shop at Boston.  Mr. Woodbury was repeatedly there while they were in use, and examined them, but he never suggested that he had any claim to the use of pressure-bars in planing machines.  There is ample evidence also that hundreds of other machines containing the same device were manufactured and sold in Boston between the years 1854 and 1870, and were frequently seen by Mr. Woodbury, calling forth no remark from him indicating that they were invasions of his rights.  In view of all this, it is of little importance that from time to time he expressed a hope to his brother, and, perhaps, occasionally to some others, that he should some time, and in some way, obtain a patent.  Such was not his language to the public.  His inaction, his delay, his silence, under the circumstances, were most significant.  Though not express avowals of abandonment, " to reason's ear they had a voice "? not to be misunderstood.  They spoke plainly of acquiescence in the rejection of his application for a patent.  They encouraged the manufacture and sale of his invention.

And there is no sufficient explanation of Mr. Woodbury's conduct, nothing which can be regarded as an adequate excuse

for it.  The rule of the Patent Office was not a statutory rule.
It was at most only a rule of practice in the office, and it was
not inflexible.  The action of the office exhibits many instances
in which departures from it were made before the act of Con-
gress of 1870 was passed, and even before Mr. Fisher, the
Commissioner of Patents, abolished it.  (Case of J. W. Coch-
ran, Commissioner's Decisions, 1869.)  If Woodbury did not
intend to acquiesce in the rejection of his application, the rule
was no bar to a movement by him to have it reinstated after
its withdrawal.  So he might have applied for a re-examina-
tion, or might have appealed, or might have filed a new one.
Thus, he would have given notice that he did not intend to
give up his invention to the public.

There is a wide difference between this case and *Smith* v.
*Goodyear Dental Vulcanite Co.*, 93 U. S. 486.  In the latter
case it appeared that after three successive rejections, the last
in 1856, the application was never withdrawn nor any portion
of the fee claimed.  Still the applicant did not remit his efforts.
He was in ill-health and wretchedly poor.  But he continued
to assert his expectations of ultimately obtaining a patent;
made frequent applications to his friends for advances to enable
him to prosecute his claim; attempted to appeal; until finally,
in 1864, eight years after the third rejection, the patent was
obtained.  The patentee had never relaxed his vigilance.  He
had left nothing undone which he could..  He had kept his flag
constantly flying.  Nobody had been encouraged by any act or
inaction of his to appropriate his invention.  His patent was,
therefore, sustained, and sustained only because he had been
guilty of no laches.  The conduct of Woodbury was in striking
contrast with that we have described, and which is described
more fully on page 491 of the report.

We are constrained, therefore, to hold that Woodbury's
invention was abandoned by him before he obtained his patent.

We also concur in opinion with the Circuit Court that the
machine built by Alfred Anson, at Norwich, Connecticut, in
1843, anticipated Woodbury's invention.  That machine was
never patented, though an attempt was made to obtain a pa-
tent for it.  On the 16th of August, 1843, Anson applied for a
patent for what his specification denominated "a new and useful

improvement in the construction of the stocks of rotating cutters for dressing and cutting window-sash stuff, &c." The specification was accompanied by a model and drawings in perspective and in detail. His application, however, was rejected; and on the 20th of August, 1844, he withdrew it, and received back $20. We have before us the specification, drawings, and model, and what is better we have the original machine, with the testimony of its builder to identify it. That testimony, as well as that of other witnesses, proved clearly that the machine had at first, as it has now, all the elements in combination which compose the combinations claimed in the Woodbury patent. It had a rotary cutter. It had a solid bed under the cutter on which the material to be operated upon was placed, and over which it was moved and fed to the cutters by an endless chain. It had two yielding pressure-bars instead of rollers, adjusted by means of weights, to keep the material down on the bed, and so arranged as to cause the pressure to be felt nearer to the cutter's edge than it could be brought to bear by pressure-rollers. The yielding pressure was effected by weights, and not by springs, as in the Woodbury machine, but these are plainly mechanical equivalents for each other.

Passing, for the present, consideration of the admissibility of the evidence respecting the Anson machine, which we will notice hereafter, we proceed to observe what it proves.

The machine was built and set up in the shop of Mr. Shepard, a sash and blind maker, at Norwich, in 1843. It has been in operation there ever since, until it was taken out to be made an exhibit in this case, — a period of more than thirty years. Some slight changes have been made in it, but none in the combination described. The evidence leaves no doubt in our minds that the pressure-bars were arranged so as to be yielding, in accommodation to the uneven surfaces of the material to be shaped or planed, and that they were intended to be so arranged for such uses. Anson himself testifies that he put in the pressure-bars because he could get these nearer the cut of the cutters than he could a roller; and in his specification filed in the Patent Office he stated, "the stuff is also kept steady by means of a bar passing from the stands $M$ and $N$, which bar may be raised or depressed in the same manner and simultan-

eously with the shafts which hold the cutters by means of the screws." He testifies, also, that he made the front bar with a rounded front, for the purpose of receiving the stuff, and that, driving the stuff under it, it would yield and the weights below would keep the stuff steady when it came to the cutters. Moreover, an inspection of the machine is sufficient to convince us that the bars are yielding, within certain limits, capable of adjustment to any varying thickness of the stuff to be operated upon.

The appellant contends that the Anson machine fails to be an anticipation of the Woodbury invention, because, as they say, it has no solid bed. It plainly has, however, a solid bed, adequate for the purposes for which the machine was intended and used, — for cutting and planing light material, sash, and blinds, and the bed is sufficiently solid for such uses. It may be admitted it would be too weak for general planing work upon boards or plank. It is comparatively a small machine. It would not cease to be the same machine, in principle, if any one or all of its constituents were enlarged or strengthened, so that it might perform heavier work. True, the bed is divided by a slit running longitudinally from one end to the other; but the two parts are arranged so as to constitute one bed, and it is not perceived why, if enlarged, it would not answer all the purposes of the Woodbury machine. Mere enlargement is not invention. The simplest mechanic can make such a modification. Woodbury's patent claims no particular form of a bed. It does not require the bed to be of any specified thickness, or constructed in one piece. Its purpose is to furnish a firm and unyielding support to the material when passing under the cutter, and that may be done as well by constructing the bed of two parts as of one. An anvil composed of two pieces is not the less an anvil, a solid block to resist the blows of a hammer. A solid foundation of a house may be composed of more than one stone. We cannot but think this objection to the Anson machine as an anticipating device is entitled to no weight.

Secondly, the appellant contends that the machine has no such pressure-bars as are shown and described in the Woodbury patent. This objection we have already considered, perhaps as

fully as need be. There is, it is true, a formal difference, but it is merely formal. The distinguishing feature of the patent is yielding pressure-bars in combination with two other elements. The Anson machine has those in the same combination. In both the machines they are substitutes for rollers, and intended to secure like advantages over the Woodworth patent; namely, while keeping down the stuff on the bed of the machine, to bring the downward pressure nearer to the line of the cut. If, in the Woodbury machine, the bars enable that pressure to be brought nearer than it is in the Anson (which is not apparent), the difference is only in degree of approximation. Such a difference would be effected in the Woodworth machine by simply changing the diameter of the rollers.

The third principal objection urged by the appellant is that the Anson machine fails, as a whole, to perform the functions of the Woodbury machine. If by this is meant that heavy plank cannot be planed by it, the objection is well taken. For such a purpose it would need enlargement and strengthening; but that all the elements claimed for the patentee's combination are found in it, producing the same results, differing only in degree if at all, is to us very apparent.

Upon the whole, after having studied carefully the evidence and the exhibits, we cannot doubt that every element found in the Woodbury machine, everything that was claimed by the patentee, existed in the same combination in the Anson machine, which was constructed and in full operation more than two years before Woodbury claims to have made his invention. Woodbury was not, therefore, the first and original inventor.

As the Anson machine has been in use, unchanged in the principles of its construction, from 1843, until it was taken from the shop to be made an exhibit in this case, it is not to be thrown aside as an abandoned experiment.

We have considered the case thus far, assuming that the Anson machine and all the testimony of witnesses respecting it is proper to be considered. The appellant objects, however, that most of the evidence is inadmissible, because the names of the witnesses called to sustain this defence of anticipation were not given in the answer. Section 4,920 of the Revised Statutes declares, that the proofs of previous invention, knowledge,

or use of the thing patented, may be given upon notice in the answer of the defendant, stating the names and residences of the persons alleged to have invented, or to have had the prior knowledge of the thing patented, and where and by whom it had been used. The statute does not declare that the names of the witnesses, who may be called to testify to such prior invention or use, shall be stated in the answer. It is only the names and residences of the persons alleged to have invented or to have had prior knowledge of the thing patented that are required.

The defendant's answer in this case, as amended, set out "that said alleged invention, described and claimed as new in the letters-patent mentioned in the bill, or a substantial or material part thereof, was, before the alleged invention thereof by Woodbury, used by Alfred Anson, formerly of Norwich, and said use was known to Noah L. Cole, of said Norwich, said use being at said Norwich, in the State of Connecticut."

Anson and Cole were both examined and testified, without any objection to their competency because of want of notice. Hence it is too late to object to their testimony now. Had objection been taken at the time, the answer might have been amended. *Graham* v. *Mason*, 5 Fish. Pat. Cas. 6, per Mr. Justice Clifford; *Brown* v. *Hall*, 3 id. 531; *Phillips* v. *Page*, 24 How. 164; *Roemer* v. *Simon*, 95 U. S. 214-220.

A number of other witnesses were examined relative to the history of the Anson machine and to show that no material change had been made in its organization from 1843 to 1876, or from the time when it was first put into operation. Their names were not given in the defendant's answer, and it is now insisted that their testimony should not be received. It is, however, doubtful, to say the least, whether any objection was made to their testifying because their names had not been given in the answer. None was made specifically for that reason. After notice had been given that the defendant would proceed to take depositions at Norwich, the solicitors of the complainant requested in writing to be informed of the names of witnesses proposed to be examined, asserting a right to such information, not under the statute, but under the English chancery rules. Clearly they had no such right under our equity

rule.  The names were not given in answer to the request, and when the witnesses were called the counsel for the complainant objected to their examination *"for want of notice."* Notice of what?  The counsel of the defendant may well have understood the objection to be that the names had not been furnished in response to the application of the complainant's solicitors, rather than that they had not been set out in the answer.  An objection to the examination of a witness should state specifically the ground of the objection, in order that the opposite party may have the opportunity of removing it, if possible.  Had this been done in the present case the defendant might have postponed the examination and moved to amend his answer, if such amendment was needed.

But beyond this, it seems to be settled that the true construction of the act of Congress is that only the names of those who had invented or used the anticipating machine or improvement, and not the names of those who are to testify of its invention or use, are required to be pleaded.  It was so ruled by Mr. Justice Grier, in *Wilton* v. *The Railroads* (1 Wall. Jr. 195), and by Mr. Justice Nelson, in *Many* v. *Jagger*, 1 Blatchf. 376. *Roemer* v. *Simon*, 95 U. S. 214.  This is all that is necessary to protect a patentee against surprise.  If in regard to an invention claimed to have anticipated his own, he is informed by the defendant's answer of the names and residences of the alleged inventors, or who had prior knowledge of the thing patented, and when and by whom it had been used, it is sufficient to apprise him of the defense, and to enable him to make all needful inquiries respecting it.  He need not know who are to testify in regard to the invention or use; much less does he need to know who are to testify respecting the history and use of the prior invention, after the complainant's patent has been granted.

We think, therefore, the testimony of the witnesses objected to " for want of notice " was admissible.  And even without it' the testimony of Anson and of Cole is sufficient to show the construction and use of the Anson machine in 1843, before Woodbury's invention was made.

Upon the whole, then, our conclusions are, that Woodbury was not the original and first inventor of the improvement for which the patent now owned by the complainant was granted to him,

and that if he was, his invention had been abandoned to the public before his patent was granted.

It follows that the decree of the Circuit Court dismissing the bill must be affirmed, with costs; and it is

*So ordered.*