Booth, Judge,
delivered the opinion of the court:
This case, in point of fact at least, is sui generis. The plaintiffs’ decedent, William E. Woodbridge, on the 11th day of February, 1852, filed in the Patent Office an application for Letters Patent for a new and novel invention relating to projectiles for rifled cannon. On March 25 thereafter a patent was ordered to issue to said Woodbridge. On March 23, 1852, two days preceding the order to issue by the commissioner, Woodbridge, in a written communica *253 tion addressed to the commissioner, requested, when the order to issue letters for his patent was made, that the same be filed in the secret archives of the Patent Office, adding that if it was necessary to specify any special length of time, he would specify one year. On April 15, 1852, Woodbridge was duly notified that the order to issue had been duly made, and in compliance with his request the application had been duly filed in the secret archives of the office, subject to his direction and order as to time of issuing the patent. On December 31, 1861, 9 years, 8 months, and 16 days later, Woodbridge wrote to the then Commissioner of Patents requesting that the patent be issued on the application allowed March 25, 1852. This was admittedly the first and only effort made by Woodbridge during this long period of time to obtain his letters patent. Following this communication the commissioner, on January 4, 1862, pursuant to Wood-bridge’s request that the patent be issued, informed him that it would be issued as requested; but subsequently, on January 29, 1862, revoked his previous order and declined the issuance of the requested letters on the ground of laches and abandonment. On April 15, 1862, Woodbridge appealed from this ruling of the commissioner and lost said appeal on July 15, 1862, the board of examiners in chief sustaining the commissioner. On January 7, 1871, Woodbridge appealed to the then Commissioner of Patents in person, requesting a hearing. The commissioner acceded to the request, but through some misadventure the hearing did not then take place. Woodbridge seems to have done nothing more until January 23,1879, eight years thereafter, when he pressed for a hearing, which was granted, and on February 13, 1879, all former decisions were affirmed. Woodbridge then appealed, on April 9, 1879, from the decision of the commissioner to the Supreme Court of the District of Columbia, where, on February 28, 1880, the decision was affirmed. Twenty-one or more years after this event the Congress passed the jurisdictional act hereinafter mentioned referring the case to this court for adjudication. The plain-jiffs’ petition was filed March 7,1901, and the first deposition in support thereof was not filed for more than five years thereafter, the plaintiffs making no effort to close their case *254 until the year 1913, 12 years after the filing of the petition, and then absorbing an additional period of more than four years in filing briefs. The case was calendared by the court’s own motion on January 7, 1918, and finally argued and submitted in April, 1918. Tentative findings were announced by the court in December, 1918, and we are now concluding the final stage of the litigation on the. motions of both parties to amend the tentative findings. Thus, it is apparent that we are now considering a claim which had its origin over sixty years ago, and as to which we must first consider the. defense of latches and abandonment.
Eliminating for the moment the whys and wherefores for this anomalous condition, it is perfectly obvious that such a period of procrastination, even subsequent to the passage of the jurisdictional act of March 2, 1901, in a case so decidedly featured by laches and delays, can not in a judicial forum escape the indubitable conclusion that either some great, positive, and obvious wrong was imposed upon the inventor in ancient times, or. some ex post facto event suddenly arising in the history of the country gave rise to a consciousness that a claimed invention thought to be valueless was by said event converted into one of value of sufficient proportions to revive its initiatory validity.
It must be conceded as an elementary principle of law that a claim thus circumscribed will be rigidly scanned by the courts, and the reasons advanced for a large money judgment against the defendants must of necessity be sufficiently cogent to overcome the handicap that appears from the sequence of events upon the face of the record, and which is not, and can not be, disputed. The explanation put forward to remove this disability must be clear, positive, and free from ambiguity, and clearly attain the stage where, by the exercise of prudence and sound judgment, it would be convincing.
The jurisdictional act of March 2, 1901, 81 Stat., 1788, under which the court is proceeding, reads as follows:
“ Be it enacted by the Senate and House of Representatives of the United Statps of America, in Congress assembled, That the claim of William E. Woodbridge for compensation for the use of his alleged invention relating to projectiles for *255 rifled cannon, for which letters patent were ordered to issue March twenty-fifth, eighteen hundred and fifty-two, by the United States Government, be, and the same is hereby, referred to the Court of Claims of the United States, which court is hereby vested with jurisdiction in the premises, and whose duty it shall be to hear and determine, according to its usual rules of procedure—
“First. Whether the said Woodbridge was the original and first inventor of the said invention and entitled to a patent therefor.
“ Second. To what extent the said invention has been used by the United States Government, and what amount of compensation, if any, the said Woodbridge ought to receive, in equity and justice, from the United States Government for the past use of said invention. And in considering and determining the compensation to be made, if any, the said court shall, if it find that the said Woodbridge was the first and original inventor of said invention and entitled to a patent at the time of its order to issue, namely, March twenty-fifth, eighteen hundred and fifty-two, proceed and be guided in all respects as though the aforesaid letters patent had been actually issued for the term of seventeen years from the date of the aforesaid order to issue; the court to render judgment, irrespective of lapse of time, in favor of the claimant with the same effect, including right of appeal, as judgments generally of said court: Provided, however, That the said court shall first be satisfied that the said Woodbridge did not forfeit, or abandon his right to a patent, by publication delay, laches, or otherwise; and that the said patent was wrongly refused to be issued by the Patent Office.”
The language of the jurisdictional act, and the fact of its enactment, warrants no intendment favorable to the claim. It makes no admission of liability and simply provides a forum for a judicial ascertainment of the plaintiffs’ rights. United States v. Mille Lac Indians, 229 U. S., 498. The court will observe its express mandates and proceed in harmony with its terms. The grant of jurisdiction from the terms of the act is sufficiently comprehensive to cover the usual and ordinary contentions involved in patent litigation.
The proviso to said act enjoins upon us a preliminary investigation. We are to be first satisfied that the plaintiff “ did not forfeit or abandon his right to a patent, by publication delay, laches, or otherwise, and that the said patent *256 was wrongly refused to be issued by the Patent Office.” This language is clear and free from ambiguity; it does not admit of strained construction, and in the light of the long history of events concerned in the proceedings taken with reference to the patent, unmistakably indicates both a knowledge of these events by Congress, as well as an intent to save the defense by positive law. The provision is in effect a condition precedent to the plaintiffs’ right of recovery. It can serve no other purpose in the context of the statute. A defense predicated upon abandonment, forfeiture, etc., would have been open to the defendants without this clause under the preceding terms of the law. When, however, Congress in a mandatory provision of the jurisdictional act enjoins a positive condition precedent, a preliminary requirement which must be met before further substantive proceedings may go on, it is a legislative burden cast upon the plaintiffs to meet. We need not cite authorities to sustain this principle.
Nor do we assent in toto to the ingenious analysis of this proviso by the plaintiffs’ attorney. This is a patent case governed by patent law, and obviously the court will confine its decision to adjudications of the courts with respect to patent litigation, but the scope of the inquiry as to this issue is not limited to any such narrow channels as contended for. The Congress knew that the plaintiff had applied for letters patent; that the application had been allowed and deposited at plaintiffs’ request in the secret archives of the Patent Office. They knew also that no further proceedings had been had by the plaintiffs to obtain the letters until 1861, and they were cognizant of what took place thereafter; hence the very language of the law especially imposes upon the court the investigation of this particular status, in all its detail and legal effect, tending toward or establishing the question of abandonment, forfeiture, laches, and wrongful issue.
Taking up the history of the plaintiffs’ case as it appears of record, it is first evident that Dr. Woodbridge was a very eminent inventor of his time; several patents duly issued attest his skill and learning, and therefore exclude any notion that he was in anywise ignorant of the essential pro *257 ceedings to acquire a patent, or of its value afterward. In 1850 he brought forth the invention for the use of which by the defendants this suit is brought. The defendants, at the request of the inventor, in December, '1850, gave his invention an experimental trial. It can not be claimed, in view of the written report of the experimental trial made by two distinguished ordnance officers, that the inventor up to this time had accomplished more than a mere demonstration that he had conceived an idea which might ultimately develop into a useful and practical invention. As a matter of fact Col. Huger, who had personally conducted the trial, pointedly observes that an expense of about two hundred and fifty thousand dollars would have to be incurred to bring the invention within the range of practical utility, requiring, in his judgment, five years of time to effectually demonstrate the fact. Dr. Woodbridge sensed the force of the report, for, according to his own statement, he thereafter made at least one, and possibly more than one, ineffectual effort to induce Congress to appropriate sufficient funds to enable a continuance of the experiments.
On February 11,1852, he filed his application for a patent, the one in suit, and in March of the same year preferred his written request to the commissioner that the application might be filed in the secret archives of the department, recognizing in the communication that the request so made was to be at his own risk, and limiting the secrecy to a period of one year. It is true that he qualified the time limit and also gave as a reason for the specific request his desire to obtain a patent in a foreign country. The order to issue the letters patent followed in March, and his application was, as he had requested, duly filed in the secret archives of the office.
In December, 1852, Dr. Woodbridge, the original inventor, published and circulated extensively both at home and abroad a pamphlet disclosing in detail the device covered by his application for the patent allowed in March, 1852; he quoted extensively from the reports of the experimental trial by the United States Government, and the pamphlet was received in public libraries, by Members of Congress and various other persons interested in this especial art, but *258 nowhere in said pamphlet did he disclose that even an application for a patent of the device had been filed, either in this country or abroad, much less a secret order for its issue. As a matter of fact no attempt was ever made to secure a foreign patent.
Thus the matter rested for nine and one-half years without a single intervening effort upon the part of the inventor to obtain his letters patent, or in anywise disclose to the public that he even contemplated the procurement of the legal monopoly of 14 years granted by the patent law. Woodbridge in his deposition states that in 1861, after the beginning of the Civil War, on a visit to the West Point Military Academy, in the interest of the adoption of his patent by the defendants, he learned for the first time that the defendants were really using his patent. The way in which he obtained this information was the similarity of the patent granted to Mr. Hotchkiss with his own, the defendants in fact using the Hotchkiss patent. The day of the month of this visit is not given, but we do know from the findings that on December 31,1861, Dr. Woodbridge, for the first time since April, 1852, evinced an active interest in the final procurement of his letters patent, so long reposing in the hidden archives of the Patent Office. The decedents’ letter of December 31,1861, not only requests the issue of his letters patent in accord with the order to issue entered in 1852, but somewhat in detail seeks an emendation of his original specifications and claims in order to broaden and enlarge the same, so as to include features which were not inoluded in the original application. On January 4, 1862, the commissioner replied to his request, acceding thereto, but denying the right of emendation except as it might be accomplished by a reissue of letters patent. Twenty-five days later, however, on January 29, 1862, upon a reconsideration of the decedents’ request, it was denied in toto, and a positive refusal to issue the requested letters was entered by the commissioner, accompanied by statements of the reasons therefor. The commissioner pointed out to him the forfeiture and abandonment of his rights by prolonged delay and cited the rules of the department and an adjudicated case to sustain his ruling. In April following Dr. Wood- *259 bridge appealed to the Board of Examiners, which board sustained the commissioner, and almost nine years later, viz: on January 7, 1871, Woodbridge prosecuted an appeal from the Board of Examiners to the Commissioner of Patents, the former ruling being again affirmed, whereupon he appealed to the Supreme Court of the District' of Columbia, resulting in a final affirmance of the commissioner’s decision.
The reason advanced, and the only one of record, for this most unusual proceeding, is found in Finding IV. From it two motives are discernible. First. The patentee conceived the course followed as best adapted to attaching money value for the use of his patent. Second. The Government was his only customer, and then not an available one, until its future necessities might make it so. However much the reasons set forth in Finding IV fail to harmonize with those appearing in the letter of March 23, 1852, nevertheless, if there is nothing in this long course of procedure which followed that conflicts with the law, the plaintiffs are within their rights and entitled to what they claim.
We are by the contention urged confronted in the first instance with the legal proposition that a patentee may at his own request conceal the fact of an allowed order to issue a patent for the space of nine and one-half years from the public and intervening inventors, the latter having in all respects complied with the patent law, and then at the moment when patented devices of such a character become of immense value, step in to the prejudice of a party who has had neither actual nor constructive notice of the existence of such a patent, for it must be remembered that between March, 1852, and December, 1861, fourteen inventions covering this identical art were passed to patent and letters granted. The mere statement of the proposition would seem to bring its own refutation. The plaintiffs are not in the position of suing for the use of the patent invented in 1852; their claim is founded upon the anelogy of the 1852 patent to a long list of patents issued to various patentees during the period between 1852 and 1869, and for which compensation has been paid them by the defendants.
There is one principle of patent law established beyond peradventure — that is, that the monopoly granted by the *260 patent laws was never intended for the exclusive profit or advantage of the patentee, but includes within its intent the benefits to the public at large as well as the stimulation and advancement of the useful arts and sciences, and while the patentee may be under no obligation to put his patented invention upon the market after he has secured his monopoly, he is burdened with the necessity of disclosing the fact of the existence of such patent through the processes prescribed by law, in the jurisdiction granted by Congress to the officials of the-Patent Office. We have no such thing as a secret patent, much less a system of prescribed legality by which a patentee may defer the commencement of the period of monopoly by secreting his allowed application for a patent for a long term of years and thus indirectly prolong such period beyond the time fixed by law, by claiming monopoly from the date of the Letters Patent.
Section 8 of the act of July 4, 1836, 5 Stat., 121, provides, in part, as follows:
“And whenever the applicant shall request it, the jjatent shall take date from the time of the filing of the specification and drawings, not however exceeding six months prior to the actual issuing of the patent; and on like request, and the payment of the duty herein required, by any applicant, his specification and drawings shall be filed in the secret archives of the office until he shall furnish the model and the patent be issued, not exceeding the term of one year, the applicant being entitled to notice of interfering applications.”
It is apparent that the terms of the foregoing statute do not authorize the secreting of applications for a patent indefinitely. The law was clearly intended to protect incomplete applications, to withhold them from publicity fora specified time to enable the applicant to perfect his application. It gave two substantial privileges; the patentee might claim patent rights antedating the date of the issue of his letters patent six months, and he did not jeopardize his monopoly for a year after issue for failure to file a model, the law expressly authorizing the commissioner to file his papiers in the secret archives of the department, for at this time the law made the filing of a model a condition precedent to the issuance of Letters Patent. The rights *261 secured to patentees in the then state of the law were manifestly just. Many serious disadvantages might accrue to a patentee through an omission to comply strictly with the rules of procedure in the patent office, when he had in fact conceived a real invention, and the act of 1836 was evidently designed to enable a patentee to get his proper papers on file and comply with other necessary details at the later period of time stated in the act. The decedent never at any time brought himself within the provisions of the act of 1836. On the contrary, his application was completed and allowed, all fees paid and model on file at the very time he requested the filing of his papers in the secret archives of the department. He was not entitled under this statute, giving it the very broadest construction, to more than have his letters patent antedate the date of the issue of the same six months, i. e., from the date the application was filed instead of the date of actual issue of the letters patent. This he did not request, and what he did request was acceded to without any authority of law whatever. The counsel on both sides have exhausted the patent law in search of some authority for the act of the commissioner and failed. It can not be cited. It is not a strained inference drawn from the letter of request written by the plaintiff to the commissioner on March 23, 1852, and the commissioner’s reply of April 15, 1852, that the commissioner believed he was acting under the act of 1836, for the letter of Dr. Wood-bridge specified the term of one year as covering the length of time he wished to avail himself of the secret archives. Mr. Decker, an expert witness for the defendants, testifies that the model was filed February 13, 1852, and while this fact would seem to overthrow any surmise of want of knowledge of said fact on the commissioner’s part, nevertheless this seems the only reasonable hypothesis upon which the action could have been taken. We find no proof of the recognition of a practice long indulged covering the facts in this case, and we are positively left to surmises and inferences as to how it happened to be allowed. Of one thing we think we are certain, and that is, such a practice finds no legal authority for its indulgence. At the very best the act of 1836 was a permissive statute, granting a limited privilege *262 at the option of the patentee, entailing but one positive duty upon the Patent Office, and that was to notify the applicant of interfering applications, if any, within the year. It can not be enlarged into the grant of a substantive right of indefinite secrecy in behalf of patentees, or made the basis for the erection of secret archives in the Patent Office wherein inventions reacty to pass to patent may repose free of notice to the public and intervening inventors at the will of the inventor making such a request.
One contention vigorously asserted in behalf of the plaintiffs is that the Patent Office wrongfully refused to issue Woodbridge his letters patent on January 29,1862. In order to attach wrong to the commissioner’s act we presume it must have been legally wrong. To arrive at a conclusion under this issue we must, if it is possible, ascertain the law governing the conduct of both parties to the transaction, and their relative position in relation thereto. There was no legal authority upon which the Commissioner of Patents could rest his granting of the request to file the decedents’ papers in the secret archives of the department, for in any event a longer term than one year, and a fortiori there was no legal right of the plaintiff to make such a request. Everyone is presumed to know the law, and while as between the two parties thus acting contrary to the law, rights of property might not be unduly jeopardized, the rights of third parties can not be affected to their great injury. Thus Ave are asked to say that a mutual mistake of law may be corrected nine and one-half years after it is made, in order that one of the parties thereto may acquire legal title to an invention which under the law he should have acquired at the time, and recover from a third party without notice a sum of money approximating a half million of dollars, for we must not overlook the fact that if the decedent Avas entitled to his letters patent in 1861 his right of action as for infringement or on an implied contract immediately obtained. There is no claim, and can be none, that the defendant in this case had any knowledge whatever of any patent rights upon the part of the plaintiffs herein when it used the devices it did use. Must it be sustained by citation of authorities that where a party avails himself of a limited *263 legal privilege granted under an act of Congress, and then' throngli bis own neglect allows the limitation therein to lapse and continues for a long space of time in his negligent conduct, that he is not thereby precluded from availing himself of the privilege ? The act of 1836 expressly warned the decedent that one year, and one year only, was the period of time within which he must assert his legal rights. There was the single duty cast upon the commissioner of warning him of intervening rights by way of interferences during the year; he did not have to summon him to a final assertion of his rights; Woodbridge must take care of himself, and inasmuch as he made absolutely no assertion of said rights until more than eight years after the expiration of the time limit, the right to so assert was lost, and with it goes the right of the commissioner to act, even if he were so disposed, and this is giving the decedent the benefit of the very broadest construction allowable of the act of 1836. As a matter of fact, it is extremely doubtful in any event, if the commissioner had any legal right to do what he did in 1852, or the plaintiff to prefer the request he did prefer at the time.
After days and days spent in a review of the long list of authorities cited in the briefs of counsel for both sides, we find in them no case which raises the issue as it is presented by the facts herein. The plaintiffs’ attorneys, with manifest confidence, cite two cases as apropos, Smith v. Goodyear Dental Vulcanite Co., 93 U. S., 486, and Colgate v. Western Union Telegraph Co., 6 Fed. Cases, 85.
In the Smith case the inventor filed an application for a patent in February, 1856, and did not receive his letters patent until June 7, 1864. The impediments in the way of his long delayed success were not placed there by any act of the inventor; on the contrary, he was protesting, and protesting as vigorously as his limited financial resources would permit, that he had been unlawfully deprived of a patent. Three applications had been filed and rejected by the Patent Office. At every stage of the proceedings he was met with adverse rulings from the department, which he was unable to appeal from because of extreme poverty. The plaintiff never, at any time, withdrew his original application or *264 applied for or accepted the fees he had paid. As the court very pointedly observed:
“He did not withdraw his application. He did not ask for a return of part of the fee he had paid, nor by any act of his did he indicate acquiescence in the unfavorable action of the Patent Office * * *. He appears never to have remitted his efforts until 1846 * * *. The office practically -acknowledged that the prior rejection had been an error.”
The case itself was a close one, three Justices dissenting. Contrasting it with the present controversy it seems to us as obviously distinct. The facts in the Smith case detail an acute controversy between the plaintiff and the Patent Office, one vigorously contending for the allowance of his application for a patent and protesting against its rejection, and the other holding adversely to his contention, until finally acknowledging previous error, seeks to right the wrong. Dr. Woodbridge had no difficulty with his application for the patent in suit in the Patent Office. No adverse rulings by the department halted his proceeding or in any manner thwarted his legal right to letters patent. Pie could have had them for the asking. Instead of completing the transaction, as he had an unobstructed right to do, and obtaining his letters patent, at his own request, he postpones doing what he should have done for a long period of years, during which time, so far as this record discloses, he was not restrained by either financial or other reasons, and then when in his judgment his invention becomes valuable, seeks to obtain letters patent, freely and easily obtainable almost a decade previous. In the Smith case there exists a public record unobscured by secrecy; in the Woodbridge case the papers were reposing in the secret archives of the department at the pleasure, to say the least, of the patentee. In the Smith case the plaintiff was continuously active; in the other, positively inactive until it became to his financial interest to act. There was nothing in the conduct of the inventor in the Smith case to indicate an intention to abandon his rights; certainly nothing authorizing an inference to that effect in the face of the facts he offered in excuse for delay.
*265 In Colgate v. Western Union Telegraph Co., supra, a case similar in most respects to tbe Smith case, we find little, if anjq analogy with the present case. The conduct of Simpson, the original inventor in the Colgate case, as compared with the acts and conduct of the original inventor in this case, is emphatically the opposite. Simpson, between the years 1848 and 1853, bombarded the Patent Office from every angle of dispute and protest against the rejection of his application. At least 22 communications or actions of one kind and another emanated from him, either by letter or personal interviews. It is true he desisted in 1851, making one effort in 1853, because of poverty, or as the court puts it:
“lie might have taken an appeal from the decision of October, 1849, but the treatment he had received from the Patent Office, afterwards acknowledged by it to have been wrong and unjust, and the array of distinguished names and telegraphers presented by the office to discourage him, with statements showing how greatly the office relied on information received from them, might well have deterred him from entering, at the time, on a further contest.”
Thereafter, in 1858, he resumed the contest, and with commendable persistence and activity he maintained it until successful, the court finally sustaining his rights as against intervening inventions upon the ground of a wrongful and illegal ruling in the first rejection of his application which he had never withdrawn, notwithstanding he had applied for and received repayment of his fees. It was said in Adams v. Jones, Fed. cases No. 57, quoted with approval in the opinion of the court, that by the application filed in the Patent Office, the inventor makes a full disclosure of his invention, and gives public notice of his claim for a patent, and that the delay afterwards interposed by the mistakes or obtuseness of public officers where gross laches can not be imputed to the applicant, can not affect his rights.
We need indulge in no further comment as to the contrast between the Colgate case and the pending one, except to point out the very great contrast between the diligence of Simpson and Woodbridge subsequent to the refusal to grant the application made at the beginning of the first period of *266 delay. From 1858 to 1867 Simpson continuously pressed his claims; he suffered no obstacle to deter him. In January, 1862, Woodbridge was notified of a refusal to issue his Letters Patent; in July following an appeal was taken to the board of examiners in chief; the decision of the commissioner was affirmed and Woodbridge notified on July 15, 1862. It was almost nine years thereafter, viz, January 7, 1871, before he appealed from the decision of said board, and it was not until the year 1879 that the appeal was brought to a hearing. .
A careful examination of the long list of cases cited bj-the plaintiffs’ counsel, too many, indeed, to review in detail, forces the conclusion that they are all predicated, as were the two cases cited above, upon a wrongful and illegal ruling of the Patent Office upon the first application for patent, which was not thereafter withdrawn but followed by persistent protest, both to the department and the public against a manifest injustice, and in all of which appear that laches alone is relied upon as conclusive evidence of abandonment.
We do not wish to be understood as now asserting the doctrine that mere lapse of time is sufficient as a single factor in determining the question of abandonment. It is of course a fact, and a very potent one, in reaching the ultimate conclusion upon the subject. We have not approached the case from any such angle. But lapse of time, coupled with the incidents of the periods of delay, and the circumstances of the case in the light of the conduct of the one attempting to excuse it, make up the record from which the question of abandonment and forfeiture must rise.
The authorities sustain, without exception, the doctrine of abandonment in all cases where it is properly made out. “An inventor can not without cause hold his application pending during a long period of years, leaving the public uncertain whether he intends ever to prosecute it, and keeping the field of invention closed against other inventors. It it not unfair to him, after his application has been rejected, and after he has for many years taken no steps to reinstate it, to renew it, or to appeal, that it should be concluded he has acquiesced in the rejection and abandoned any intention of *267 prosecuting bis claim further.” Planing Machine Co. v. Keith, 101 U. S., 479, 485.
While the decedent herein never suffered under the disability of a rejected application, can it be said that he is in a more fortunate position than one so handicapped, and relief will be extended to him in case of delay but denied to his less fortunate fellow inventor? He possessed and secured a substantive legal right; its full use and enjoyment was open to him without condition or restraint. The only act he needed to have done was complete his application by a request for his letters patent, which awaited him in the Patent Office. This he did not do, but, contrary to law, clothed his transaction in profound secrecy for nearly a decade, never disclosing to the public that he even contemplated a patent for his invention, nor making the slightest effort to assert his claims, until a sudden public emergency made valuable what during all these years was practically valueless. Certainly it can not be said that the spirit and intent of the patent laws will be advanced by allowing a patentee to conceal his invention for an indefinite time for his own profit and advantage, and then suddenly come forward, when future events make the device valuable, to the prejudice of intervening inventors and the defendants herein, who pursued their course in utter ignorance or notice of any rights or claim of rights upon the part of the lagging claimant. As said in Egbert v. Lippmann, 104 U. S., 833, 337:
“ It is fair to presume that having learned from this general use that there was some value in his invention, he attempted to resume, by his application, what by his acts he had clearly dedicated to the public.”
Again, as well said in Kendall v. Winsor, 21 How., 322:
“ He may forfeit his rights as an inventor by a wilful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others. Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community. must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these.”
*268 The defendants have cited innumerable cases wherein the courts have not hesitated to interpose as between the diligent and the negligent in patent cases, beginning with Kendall v. Winsor, supra, and extending through the whole line of cases to the more recent ones. It will serve no useful purpose to encumber this already too lengthy opinion with their citation or review. The doctrine of abandonment is too well established to be overthrown now, notwithstanding the peculiar features of this case.
The record discloses that Dr. Woodbridge voluntarily sought secrecy for his application for a patent, as well as the order to issue his letters patent; that he obtained said purpose, it being granted without authority of law; that thereafter for a space of nine and one-half years he made but one substantial effort to have his patent adopted and put in use; that said effort was futile, and thereafter no effort of any sort was made, no notice of any character given that he claimed or intended to claim a patent for the device he had previously applied .for, until he discovered the fact that a somewhat similar device, for which another in the meantime had been granted a patent, was being used by the Government of the United States during the Civil War. whereupon he instituted the proceedings resulting in the present suit against the Government. We can not escape the conclusion, in Anew of these facts, that Woodbridge abandoned his right to letters patent. He admits in a positive statement that the course he pursued was entirely selfish, engaged in to delay the issuance of his patent until the wants of the Government might make it valuable before the date of expiration, clearly demonstrating that in his own mind at least he maintained a doubtful and inchoate purpose to perfect his patent only in the event it would be worth while to do so, and so long as that event failed to materialize, it might rest in secrecy, free from the scrutinizing research of other inventors, and unknown to those who might innocently trespass upon his hidden rights.
Much emphasis is given the public pamphlet voluntarily circulated by Woodbridge, wherein it is alleged he disclosed his invention. There are circumstances in patent contests in which such a publication becomes an important fact. *269 Unfortunately for him, this is not one. How it can be pretended that a paper, such as is here disclosed, was sufficient in itself to give public notice, either that the person issuing it was the inventor of the device set forth or that he intended to apply for a patent therefor, or that he had so applied, is to us inexplicable. The attorney for the plaintiff asserts that any statement in the paper that Dr. Woodbridge was the inventor, or had applied for a patent, “ was entirely uncalled for at this time,” followed with the general observation “ that it was generally understood by the officials of the Government that he claimed to be the inventor of the invention or plan.” What may or may not have been the general impression of the officials of the Government in 1852 can hardly be held to have descended in unbroken sequence to the officials of the Government in 1861. There is no positive proof that the identity of the officials remained the same, and we are at a loss to comprehend the legal force of a proposition that mulcts the defendants in a large money judgment, dependent upon general impressions, when a system of positive laws points out a precise method whereby positive notice of legal rights protects alike both the patentee and the user of his patented device. That the defendants never intended to wrong the plaintiff is obvious, and if they have wronged him, it must be so held on the doctrine of constructive rather than actual notice of his patent rights. The pamphlet did not clear the situation; it gave no notice of any patent rights or intention to obtain the same. That the information there given was not available for public use nowhere appeared. Surely this is insufficient to sustain a patent.
We have not gone, and will not go at length into the details of the Woodbridge device and its supposed infringement by the Government in the use of the devices it did use, believing the case concluded upon what has heretofore been said. The court in this respect concludes, however, that the devices used by the Government did not infringe the plaintiffs’ invention. The similarity between the devices is found in plaintiffs’ claim number one. Reading said claim it is clearly apparent that the purpose for which the. decedent employed the “ extensible metallic ring or sabot ” *270 was in his own words “ diminishing the windage and giving the ball its motion in the direction of the axis of the bore.” He never conceived the idea that said ring or sabot of claim one could be used to communicate the rifle motion to a projectile, as evidenced by his second claim. The central idea of his conception was to communicate the rifle motion to a projectile in a rifle-bored gun, and to accomplish this purpose he specifies in his second claim the addition of projections to ring or sabot in combination with the rifle bore, the projections being the vital functioning element of his device to give rifle motion, the ring to prevent windage, etc. The inventor himself caught the force of this omission after he had seen the Hotchkiss guns in operation for he sought to amend his claims in 1861, saying: “The principal idea of the invention was the application of an extensible ring of metal to a tapering part of a projectile in the rear of its greatest diameter, so that the ring might be made to enlarge its diameter by stretching under the action of the powder, at the same time clasping the ball, filling the bore of the gun, and taking hold of the grooves.” You will search the inventor’s claims in vain to sustain the belated contentions thus put forward. What Dr. Woodbridge claimed as his invention in 1861 was not what he claimed in 1852, but was in reality the Hotchkiss idea he had gotten at West Point prior to preferring the amended claim, and which, if allowed, would have made Hotchkiss and the Government infringers.
Dr. Woodbridge was not a pioneer inventor in this particular art. On the contrary, the principles he embraced within his claim had been theretofore conceived, as fully attested by the emendation of his claims to meet the state of the prior art. Therefore his claims are not entitled to the broad construction insisted upon by him in 1861. He submitted without protest to the rulings of the Patent Office calling his attention to the state of the prior art, and refusing his original claims, as they then stood. The applicant willingly adopted the amendments suggested and thereby assented to their limitation; at least he made no effort until nine and one-half years later to enter a protest. The findings, we think, show that uñder the limited claims, grant *271 ing arguendo their validity in every respect, the defendants did not use his device, and hence can not be under any legal obligation to respond in damages.
The petition will be dismissed. It is so ordered.
Geaham, Judge, Hat, Judge, DowNey, Judge, and Campbell, Chief Justice, concur.