## ALLINSON MFG. CO. v. IDEAL FILTER CO.

Circuit Court of Appeals, Eighth Circuit.
June 29, 1927.

No. 7603.

**1. Patents ⬤—87—Abandonment of invention may be shown by things occurring before expiration of statutory period for making application for patent (35 USCA §§ 31, 69).**

Abandonment of an invention may be shown by proof of things occurring before expiration of two-year period of public use within which application for patent must be made, under Rev. St. §§ 4886, 4920 (35 USCA §§ 31, 69; Comp. St. §§ 9430, 9466).

**2. Patents ⬤—83—Abandonment of right to patent may arise from lapse of time, silence, or inaction, without intent to relinquish inchoate rights to public.**

Lapse of time, silence, and inaction in making application for patent monopoly may constitute abandonment, although there was no proof of express intent to relinquish inchoate rights to the public.

**3. Patents ⬤—87—Evidence held to establish abandonment of right to patent for machine for cleaning gasoline (35 USCA §§ 31, 69; Const. art. 1, § 8).**

Proof that patentee dismantled machine invented for cleaning gasoline used in dry-cleaning plant, and for several years engaged in other work, and did not apply for patent until his interest was revived by seeing another's machine, *held* sufficient to show abandonment of right to patent under Rev. St. §§ 4886, 4920 (35 USCA §§ 31, 69; Comp. St. §§ 9430, 9466); Const. art. 1, § 8.

**4. Patents ⬤—83—Public use need not continue for more than two years, to constitute "abandonment" of right to patent (35 USCA §§ 31, 69).**

Under Rev. St. §§ 4886, 4920 (35 USCA §§ 31, 69; Comp. St. §§ 9430, 9466) public use of invention need not continue for more than two years, in order to constitute "abandonment" of right to patent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandon—Abandonment.]

**5. Patents ⬤—87—Evidence held to establish public use, constituting abandonment of right to patent (35 USCA §§ 31, 69).**

Evidence *held* to establish a public use for more than two years, constituting abandonment of right to patent for machine for cleaning gasoline used in dry-cleaning plant, under Rev. St. §§ 4886, 4920 (35 USCA §§ 31, 69; Comp. St. §§ 9430, 9466).

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Davis, Judge.

Patent infringement suit by Allinson Manufacturing Company against the Ideal Filter Company. From decree of dismissal, plaintiff appeals. Affirmed.

Amasa C. Paul, of Minneapolis, Minn., and Bair & Freeman, of Des Moines, Iowa (W. P. Bair and Will Freeman, both of Des Moines, Iowa, on the brief), for appellant.

Harry A. Beimes, of St. Louis, Mo., for appellee.

Before LEWIS and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

LEWIS, Circuit Judge. Appellant's bill of complaint charges that it is the owner by assignment made December 28, 1921, of all rights granted to William Allinson by U. S. Letters Patent No. 1,395,694, of date November 1, 1921, for an apparatus for purifying gasoline and for which Allinson made his application on October 9, 1920; that appellee, subsequent to the date of said Letters, has made and sold machines of the kind therein described and thus infringed on claims 14 and 15, which are in these words:

"14. An apparatus for purifying gasoline or the like, comprising a tank, a container below said tank, a restricted neck or passage leading from the bottom of said tank to the top of said container, an intake tube leading into the lower part of said container, and valve controlled, vertically spaced outlets for said tank."

"15. This claim is in the same words as claim 14, with the addition thereto of this clause: "And a pump for forcing gasoline or the like through said intake pipe."

The relief sought was judgment for profits and damages and that appellee be enjoined from further infringement. Appellee answered and the case went to final hearing on the issues of (a) infringement; (b) anticipation of Allinson's discovery, as shown in prior named patents; (c) public use by Allinson of the claimed invention for more than two years prior to the filing of his application; and (d) abandonment by him prior to said application. The court found in favor of appellee on the two last named issues and dismissed the bill; no opinion or finding was expressed or made on the other two. Either issue decided by the trial court disposes of the whole controversy, if it was adjudged correctly; and that is the primary challenge in this appeal. The inquiry on both issues arises from constitutional provision and statutory requirements on the subject of patents. The first (article I, § 8):

"The Congress shall have power * * * to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

The second, passed in exercise of the power (R. S. §§ 4886, 4920 [35 USCA §§ 31, 69; Comp. St. §§ 9430, 9466]), are these:

"Any person who has invented * * * any new and useful * * * machine, * * * unless the same is proved to have been abandoned, may * * * obtain a patent therefor." "In any action for infringement the defendant * * * may prove on trial * * * that it had been in public use or on sale in this country for more than two years before his application for a patent, or had been abandoned to the public."

And these requirements, both as to prior use and abandonment, present here questions of fact which were decided against appellant. [1] These issues are, of course, different— one a statutory bar, and the other at large on facts to be established; but, plainly the latter may be made out on proof directed to what occurred either before or after the bar had fallen. The patentee may make his application within the two years limitation period, and yet if it be shown that within that period he relinquish all claim to his discovery, his inchoate right is thereby lost to him, for it is a sound principle that:

"This inchoate right, thus gone, cannot afterwards be resumed at his pleasure; for when gifts are once made to the public in this way, they become absolute." Shaw v. Cooper, 7 Pet. 292, 318 (8 L. Ed. 689).

The limitation period may have fully run, but poverty, ill-health or other circumstances over which the patentee had no control may relieve him from the bar. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 501, 23 L. Ed. 952; Planing Machine Co. v. Keith, 101 U. S. 479, 488, 25 L. Ed. 939. [2] And yet lapse of time, silence and inaction thereafter in making application for the monopoly may constitute abandonment. This is characterized as willful or negligent postponement, in contravention of the policy and objects of the Constitution and Acts of Congress on the subject, operating as a forfeiture of the patentee's rights and thus constituting abandonment by him, although there be no proof of an express intention on his part to relinquish his inchoate rights to the public. With these principles in mind, which, we think, the authorities hereinafter cited sustain, we will attempt to state all of the proof bearing on these two subjects. Before doing so we think it necessary to give a general account of the situation at the time Allinson first made his discovery and constructed and used his apparatus in 1914.

[3] Gasoline is used, and for long has been used in clothes cleaning establishments for the removal of dirt, grease, oil and other soiling substances which accumulate on and in clothing and other textile fabrics. As it is used the gasoline becomes mixed with this refuse, both in solution and suspension, and they must be removed before it can be used again for cleaning purposes. Prior to 1914, or thereabout, there were several methods for doing this. Perhaps the first was the settling tank, into which the gasoline was poured and time given for precipitation, but this did not remove all impurities. In using this method it had become a common practice to put into the gasoline and thoroughly mix with it a solution of Gold Dust, caustic soda or like chemical as an aid to clarification. The filtration method was also used, and redistillation. Allinson was using the latter in his cleaning establishment at Des Moines in 1914. In July of that year he conceived the idea disclosed in his patent. He stopped using the distillation method. He thereafter used the egg-shaped container, in which he had been distilling dirty gasoline, as a tank, placing below it an inverted cone-shaped member (called "container" in his patent) and connecting the two with a neck or narrow passage; he then extended his supply pipe through the tank (old still), on through the neck and into the cone-shaped member below, to within two inches of its bottom; he poured into the upper part of the tank a solution of caustic soda or other like chemical mixture, which sank through the neck and settled in a bed on the converging bottom of the cone-shaped member. Then by means of a pump attached to his supply pipe he forced the dirty gasoline into the bottom of the cone and it gradually rose through the chemical bed, through the neck or narrow passage and into the tank above, and was thus cleansed of its impurities and drawn off ready for reuse. This was a distinct improvement on the old methods. More of the gasoline was recovered and made fit for reuse and it was done more cheaply and more quickly than had been done by the older practices. As the gasoline passed upward through the chemical bed the removed greases and oils formed a soapy and dirty mixture which settled on top of the chemical and through which the rising gasoline must also pass, and this was in aid to the cleansing of the gasoline. The narrow passage between the cone below and tank above retarded the movement of gasoline upward and the narrowness and depth of the chemical prevented the forcing of open passageways by the rising gasoline through the accumulating bed. When the refuse piled up through

the neck into the tank it was all cleaned out by means at the bottom of the cóne. Then a new supply of chemical solution was put in and the process of renovating the gasoline went on. Allinson at once found that it was a success, it worked satisfactorily and cleaned his gasoline. He continued to use it from the time he installed it in July or August, 1914, until he sold out late in December, 1916.

Allinson testified for plaintiff, both in chief and rebuttal. He said he sold his business to the Des Moines Dress Club, he did not sell his plant. He had 600 to 800 gallons of gasoline on hand, which he sold to a vulcanizing concern, provided he would still it out and get it white, back to its natural color, and in order to do this he had to fix up the still in its original form, that he took off the cone-shaped member, distilled the gasoline and then sold the still with the rest of the machinery. He intended to go into the moving picture business and after selling out in December, 1916, he was in that business for about eight months. That proved to be unsuccessful and thereafter he was employed by different cleaning establishments for about three years. None of those establishments used the method of renovating gasoline which he had devised. He did not tell his employers about his discovery. He said he preferred to keep the benefit for himself until he got ready to use it, that he was in no position to start in the manufacturing business; that in February, 1920, he attended a convention of cleaners and dyers at Waterloo, Iowa, and there saw a machine for clarifying gasoline made by Le Vora. Le Vora filed application for patent on his machine January 12, 1920, and patent was issued to him October 26, 1920. In some of its general aspects the Le Vora machine is like the one devised by Allinson, in others it is different. He has not the cone-shaped member below and the neck connecting that member with the tank above. Le Vora's tank has a converging bottom and a long narrow extension downward, into which a chemical solution is placed and through which the gasoline must rise from the vent of the supply pipe. When Allinson saw Le Vora's machine at Waterloo he told someone present that he had built a better clarifier than Le Vora's. About ten months later he filed his application for the patent in suit. He also began manufacturing his machine in June, 1920, and sold the first one in July of that year. He had three men employed while he was engaged in the cleaning business during 1914, 1915 and 1916, but he operated the machine himself during that time. They worked in the room where the machine stood. He testified that he did not allow any one in the cleaning room except his help, that he had strong competition, reclaiming gasoline was quite an item and he did not want any one to know how he could compete with them in their prices, the way he could do that was he was clarifying his gasoline and they were distilling theirs, and he "kept that under my chest as much as possible because I thought the time might come that I would want to use it—and I have got several things under my chest, the same way, right now, that I might bring out some day." He said the reason he did not begin to make his machine until 1920 was that he had the moving picture bug in his head, that the moving picture business did not prove profitable and he then went to work for others in cleaning plants, that his then wife objecting to his venturing out in anything of that kind, that he did not have very much money to squander, along in June, 1920, he and his wife separated and he immediately started in on the clarifying business. He did not testify that he intended in 1914, or during the succeeding years, to make application for patent and he gave no sufficient reason for not doing so earlier than October, 1920. He did not testify that he was not financially able to bear the expense of an application. What he said, quoted supra, about delay seems to relate to a purpose he had of manufacturing his machine, and Le Vora's machine undoubtedly was the incentive for action. Admittedly he used his machine constantly in his own business from July, 1914, to late December, 1916, then dismantled it and manifested no further interest in it, so far as the record shows, until he saw Le Vora's machine at Waterloo in February, 1920.

Appellant offered the testimony of two other witnesses, taken by deposition, Harry Daniels and Orian Smith. They were employés of Allinson at his cleaning plant in Des Moines. Their testimony relates to the change made by Allinson from a still to a clarifier and its use. Daniels testified that he helped Allinson make the change, that they put on the cone-shaped member which opened into the old still above, there was a man-head in the tank (old still) for pouring in the solution, which was for taking the dirt out of the gasoline. When the solution was poured in through the man-head it went to the bottom into the cone. Gasoline was put in with a pump. He did not know what the solution was. He helped connect the cone member.

All the employés could see the still and had access to it after the changes were made. No instructions were given to him that the changes were to be kept secret. After the cone-shaped member was attached the gasoline that came through was like water—white. He knew that some kind of chemical was used but just what it was he did not know. He left Allinson's employ in 1915.

Smith was working at Allinson's cleaning establishment when the change was made. The cone-shaped member was put on, and the gasoline then went down into the cone member below the muck and solution that he had in there and back up and out of the pipe at the bottom of the water glass. It was forced in by a pump. The change was made for the purpose of purifying the gasoline. It was better than the method used before the change. He knew that Allinson put in a solution but he did not know what it was. He worked there for five or six months after the change was made. When the change was being made Allinson held up the intake pipe and showed him how it would work when put on the inside. It was inserted and extended down into the cone-shaped member. This was a day or two before they were put together. Daniels helped Allinson put on the cone-shaped member. When the change was made the gasoline was clarified more rapidly. The cone-shaped member was never taken off while he was there. When they wished to clean it out the water put in to clean it was drawn out at the bottom of the cone-shaped member and the muck washed out looked like mud. He said Allinson was not accustomed to let other people come in there, one thing he was afraid of was fire, and he did not want them in there in our way and he did not want people to see what we were doing and how we were doing it. He said he did not want any one to know about these changes we were making. The third employé at Allinson's plant in Des Moines did not testify.

We must take the case for present purposes on the assumption that appellant's machine was a new and useful discovery made by Allinson, otherwise he had no inchoate right to obtain a patent, subject to loss by abandonment, or to the statutory bar because of prior public use. So assuming we pass to the inquiry, Did Allinson abandon his invention before he made his application? The answer depends almost entirely upon Allinson's conduct—his silence, his delay, his inaction until some time after he saw Le Vora's machine in February, 1920, which obviously revived his interest in the subject and spurred him to ac-

tivity. During that time, almost six years, he did nothing and said nothing that manifested any intention of perfecting his right. The significance of that course and its weight have received judicial estimate. In Planing-Machine Co. v. Keith, 101 U. S. 479, 484, 487 (25 L. Ed. 939), we find this:

"It has sometimes been said that an invention cannot be held to have been abandoned, unless it was the intention of the inventor to abandon it. But this cannot be understood as meaning that such an intention must be expressed in words. In Kendall et al. v. Winsor, 21 How. 322 [16 L. Ed. 165], this court said, 'it is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public, and this he may do either by express declaration or by conduct equally significant with language; such, for instance, as an acquiescence with full knowledge in the use of his invention by others; or he may forfeit his rights as an inventor by a willful or negligent postponement of his claims.' To the same effect is Shaw v. Cooper, 7 Pet. 292 [8 L. Ed. 689]. * * * His inaction, his delay, his silence, under the circumstances, were most significant. Though not express avowals of abandonment, 'to reason's ear they had a voice' not to be misunderstood."

Allinson's inaction and delay must be considered and weighed in their relation to statutory requirements which grant rights to inventors on named conditions. It has been said that these statutory rights were not designed for the exclusive profits and advantage of the inventor, that the interest of the public was another primary object in granting and securing the temporary monopoly; and adding to this the constitutional provision, as demonstrating the whole public policy on the subject, the Supreme Court in the Kendall Case (21 How. 322, 16 L. Ed. 165) said:

"By correct induction from these truths, it follows, that the inventor who designedly, and with a view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or Acts of Congress. * * * He may forfeit his rights as an inventor by a willful or negligent postponement of his claims."

Allinson in his testimony, after stating that he sold out his business in December, 1916, said that the reason he did not begin to market his machine until 1920 was that he had the moving picture bug in his head about that time and went to Boone, leased a hotel building, remodeled it, turned it into a picture

show and ran it for a few months, until he got closed up and then went to work again in a cleaning plant. He worked in a cleaning plant at Boone for a few months, then for the Des Moines Dress Club, then for the Artistic Cleaners, then for the Century Cleaners, that his then wife seriously objected to his venturing into anything of that kind and he did not have very much money to squander. Along in June, 1920, he and his wife separated and he started immediately on the clarifying business, "not having any burdens on my shoulders but myself took a shot at it." Again, in reference to his operation of his clarifier in his plant at Des Moines from July, 1914, to late December, 1916, he said this in reference to his attempt to keep his invention a secret:

"We did not allow any one in the cleaning room outside of my helper there. There was several reasons for that. I was in quite strong competition there. Prices were down, and reclaiming your gasoline was quite an item, and I did not want any one to know how I could compete with them in their prices; and the way I could compete with them was that I was clarifying gasoline, while they was distilling it; and that thing I kept under my chest as much as possible, because I thought the time might come that I would want to use it."

We are not able to extract from his testimony an intention on his part at any time after he made his discovery to apply for a patent until after he saw Le Vora's machine in February, 1920. He did not testify that he had such an intention. It is apparent that he had some intention at some time after he quit the moving picture business, and before he saw Le Vora's machine, to begin the manufacture and sale of his invention, but that was forestalled, according to his testimony, on account of his wife's objections and because he did not have very much money to squander. Immediately after he separated from his wife in June, 1920, he started in manufacturing his machine and sold the first one in July, 1920. Just what Allinson meant in his testimony that he thought the time might come when he would want to use his machine is not clear; whether he would use it if he again went into the clothes cleaning business, or whether he would seek benefits by applying for patent protection, or whether he would manufacture it for sale. Considering the context, the latter seems the more probable. Assuming, however, that he had an intention at any time to apply for patent, which was not proven, the conclusion cannot be avoided that

he willfully and negligently postponed his application, and that, too, until after others had become engaged, to his knowledge, in efforts to discover and put in use a machine for clarifying gasoline for clothes cleaning purposes. He said the time *might* come when he would want to use it. The conditions of that possibility were not stated. It evidently did not come until he saw Le Vora's machine and the interest manifested in it at the Waterloo convention. In the light of the record we think he abandoned his rights when he dismantled his machine in 1916, went into the moving picture business and manifested no further interest in his invention until he saw Le Vora's machine in February, 1920. Woodbridge, in his case (263 U. S. 50, 44 S. Ct. 45, 68 L. Ed. 159), always intended to perfect his rights. He delayed because he was waiting for the opportunity which he knew would arrive when a patent monopoly of his invention would be of great value. It was held that he had forfeited his rights. We think it immaterial whether Allinson's inaction and lack of interest be defined as abandonment, willful negligence or cause for forfeiture. It was conduct in direct opposition to the purpose and policy of the law under which he might have acquired rights had he been diligent. The Woodbridge Case modifies the broad statement in Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68, to the effect that an inventor's right to apply for and obtain patent protection is not lost as long as he can keep his discovery secret. The opinion of Chief Justice Alvey in In re Appeal of Mower, 15 App. D. C. 144, is quoted on the point. It was there said that the statement in Bates v. Coe was a correct general proposition, "but like all general propositions, it may have its exceptions under special and particular circumstances, even where the intervening rights of third parties have not been secured by patent. The patent laws are founded in a large public policy to promote the progress of science and the useful arts. The public, therefore, is a most material party to, and should be duly considered in, every application for a patent, securing to the individual a monopoly for a limited time, in consideration for the exercise of his genius and skill. But the arts and sciences will certainly not be promoted by giving encouragement to inventors to withhold and conceal their inventions for an indefinite time, or to a time when they may use and apply their inventions to their own exclusive advantage, irrespective of the public benefit." It was held in the Woodbridge Case that an intention to abandon effort to secure a patent would be in-

ferred from delay and other circumstances indicating that intention. Macbeth-Evans Glass Co. v. General Elec. Co., 246 F. 695, was cited with approval, and it was said, as held in that case:

"* * * The policy of the patent law to secure to the public the full benefit of inventions after expiration of the fixed term deemed sufficient reasonably to stimulate invention, would be defeated if an inventor could withhold his invention from the public for an indefinite time for his own profit, and that the right to preserve a monopoly in an invention by keeping it a trade secret and the right to secure its protection under the patent laws were inconsistent and could not both be exercised by an inventor. The gist of the reason for the conclusion there was the same as here, that the purpose and result of the conduct of the inventor were unduly to postpone the time when the public could enjoy the free use of the invention."

The Macbeth-Evans Case was characterized as a case of forfeiture. The Court of Appeals, however, in its opinion in that case treated the delay and inaction of the patentee in making application as constituting abandonment of patent privileges. Enough has been said to express our reasons for holding that the trial court did not err in sustaining this defense.

[4] On the issue of public use for more than two years before application, it is hardly necessary to say that the use need not continue for more than two years, though in this case Allinson did use his machine from July, 1914, to December, 1916. In Consolidated Fruit-Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68, it was held, that the phrase "for more than two years prior" meant earlier than "two years prior," or as if "for" were omitted from the sentence. The inquiry is whether Allinson's use was a public use. There is no claim that it was an experimental use, as in Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, and other cases, which exclude experimental use for the purpose of perfecting the device from the period of limitation. It is said the discovery was kept secret, as was done in Bates v. Coe, that no one was admitted, in so far as admission could be prevented to the room in which the machine was operated, that Allinson enjoined secrecy on the employés as to the changes that had been made and that under these facts the use did not constitute public use. It was operated in the presence of at least three employés who worked in the room where the machine stood in plain view. One of them did not testify. Of the other two one testified that he assisted Al-

linson in making the changes, that all employés had access to it after the changes were made, that he knew some kind of chemical was used and that the dirty gasoline came out like water—white. No instructions were given to him that the changes were to be kept secret. The other one testified he saw the changes as they were being made, that Allinson explained to him how the machine would work after the changes were made and he knew how it was cleaned out with water. The change was made for the purpose of clarifying gasoline and it was a better method than that used before the change. For several reasons Allinson was not accustomed to let people come in—fire prevention, getting in the way of employés, and he did not want them to know what changes they were making. Allinson gave the additional reason that he had competitors in the cleaning business who used stills to purify their gasoline and he did not want them to know he had a better and cheaper method of clarification.

[5] He used his apparatus in competitive trade and reaped profits from his customers over and above what he would have received had he continued to use the still or other old methods. It was the intended use and only use to which and for which it was later manufactured and sold. These facts, we think, clearly constituted a public use within the purpose and meaning of the statute.

In Elizabeth v. Pavement Co., supra, it was said:

"Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent."

In the Consolidated Fruit-Jar Co. Case, supra, Mr. Justice Swayne approvingly quoted from Pitts v. Hall, Fed. Cas. No. 11,192, 2 Blatchf. 229, thus:

"The patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine at any time prior to two years before he makes his application for a patent. That is, he is not allowed to derive any benefit from the sale or the use of his machine, without forfeiting his right, except within two years prior or to the time he makes his application."

Mr. Justice Matthews repeated the principle by stating it interrogatively in Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, at 257, 8 S. Ct. 122, 126 (31 L. Ed. 141), thus:

"A single sale to another of such a ma-

chine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent; and yet, during that period in which its use by another would have defeated its right, he himself used it, for the same purpose for which it would have been used by a purchaser. Why should the similar use by himself not be counted as strongly against his rights as the use by another to whom he had sold it, unless his use was substantially with the motive and for the purpose, by further experiment, of completing the successful operation of his invention?"

This way of putting the principle by Mr. Justice Matthews is repeated in Root v. Third Ave. R. R., 146 U. S. 210, 226, 13 S. Ct. 100, 36 L. Ed. 946. The proposition was discussed in the Macbeth-Evans Case, supra, and authorities cited sustaining the principle. In that case it was further held that it was inconsistent to practice an invention in secret without limit of time and for profit and during the same time claim a right to obtain a patent on the invention, that it was inconceivable that an inventor could hold both rights throughout the same period, that the effect of thus practicing the invention in secret was to give up (abandon) the right to patent, and therefore a contradiction of a claim that the patentee during the same time held on to his right to secure a patent. And this statement was approved by the Supreme Court, as we have noted, in the Woodbridge Case. We believe the use made by Allinson in competitive business for profit was a public use; but if he used his discovery in secret with an intention to conceal it from the public for an indefinite time, as he says he did, then he abandoned his inchoate right to obtain patent. He could not by so doing in derogation of public right extend the term of monopoly.

The decree of dismissal is affirmed.