Julius E. FOSTER, Plaintiff,

v.

MAGNETIC HEATING CORPORATION, Thermatool Corporation, David G. Osterer, Herman C. Morris, American Machine & Foundry Company, Defendants.

No. 65 Civil 1114.

United States District Court
S. D. New York.

Aug. 23, 1968.

Alexander Kahan, New York City, for plaintiff; Robert H. Rines, Boston, Mass., of counsel.

Charles H. Walker, c/o Fish, Richardson & Neave, New York City, for defendants; William K. Kerr, Herbert F. Schwartz, New York City, of counsel.

PALMIERI, District Judge.

### Preliminary Statement

This is a patent infringement case. The patent in suit relates to the progressive continuous welding of metals. It can be used effectively with such items as sheet metal tubes.

The essential issues raised by the pleadings are whether or not this patent was infringed by any of the defendants

and whether it should be held invalid for abandonment or unenforcible for laches. In the earlier stages of these proceedings the defendants relied upon defenses to the effect that the patent in suit was invalid because it was not novel in view of the prior art within the meaning of 35 U.S.C. § 102; and additionally, because the invention would have been obvious to those skilled in the art within the meaning of 35 U.S.C. § 103. These defenses were waived at the trial. The sole ground on which the defendants have attacked the validity of the plaintiff's patent is that the same is allegedly inoperative.

Claims of abandonment and laches were the basis for a motion by the defendants for summary judgment, Fed.R. Civ.P. 56, in the pretrial stages of the case. This motion was withdrawn after argument in the light of the Court's suggestion that the issues could be appropriately decided only by trial. The papers submitted on the motion for summary judgment were by stipulation incorporated as part of the trial record.

The plaintiff patent owner and inventor, Julius E. Foster, is a patent solicitor by profession, possessing a scientific and technological background in electrical engineering and metallurgy.

For the reasons which are to be found in the findings of fact and conclusions of law which follow, this patent is held to be valid, and infringed, and plaintiff has sufficiently demonstrated his entitlement to relief.

## FINDINGS OF FACT

### The Parties

1. The plaintiff Julius E. Foster is a citizen of the United States residing in The Bronx, New York, and, at all times material herein, has been the owner of the patent in suit. Mr. Foster was formally trained in electrical engineering and has studied metallurgy. He has had considerable experimental and theoretical experience particularly in the field of welding and metallurgy, both from the engineering aspects and from his experience as a patent attorney, first with the Westinghouse Company and then more recently in private practice. He has made other inventions than the patent in suit in the field of welding and in other fields, and has received patents thereon, with emphasis upon his engineering activities as distinguished from his patent law activities.

2. Defendant Magnetic Heating Corporation and defendant Thermatool Corporation are New York corporations having addresses for service of process at New Rochelle, New York.

3. Defendant David Osterer (hereinafter referred to as "Osterer") is a citizen of the United States residing in Harrison, New York; and defendant Herman C. Morris (hereinafter referred to as "Morris") is a citizen of the United States, residing in Scarsdale, New York.

4. New Rochelle Thermatool Corporation, originally incorporated under the name New Rochelle Tool Company, was doing business in New Rochelle, New York, which included the development, manufacture, sale, lease and licensing of high frequency welding equipment until in or about February 1962, when it was merged into defendant Magnetic Heating Corporation. The two individual defendants, Osterer and Morris, together with other individuals not named in this suit, Wallace C. Rudd presently a vice-president of defendants (hereinafter referred to as "Rudd") and Robert J. Stanton (hereinafter referred to as "Stanton"), were equal beneficial owners of all of the outstanding stock in defendants Magnetic Heating Corporation and Thermatool Corporation, and in a corporation not named in this suit, New Rochelle Thermatool Corporation (hereinafter collectively referred to as "Thermatool").

5. Defendant American Machine & Foundry Company (hereinafter referred to as "AMF") is a New Jersey corporation with a principal office and place of business in New York, New York. On February 16, 1962, AMF acquired sub-

stantially all of the business and assets of Thermatool upon issuance of shares of AMF stock and the assumption by AMF of all liabilities and performances of all obligations, with certain specified exceptions, of Thermatool. Thereafter, the business was conducted entirely by AMF through its wholly owned subsidiary AMF Thermatool, Inc.

6. The defendant AMF has assumed responsibility for the defense of this infringement suit and for the payment of any judgment that may be entered against any of the defendants based upon the infringement charge.

## The Patent in Suit

7. The Foster patent in suit is United States patent No. 2,882,384, entitled "Welding System". It relates to the progressive continuous welding of such items as sheet metal tubes with the aid of a pair of electrodes to which is applied an alternating current voltage for the purpose of supplying electric current for heating the edges of the tube to weld the same together in a continuous process as the sheet metal is folded into tubular form and drawn past the electrodes.

## The Prior Art and the Teachings of the Patent in Suit

8. Welding apparatus of this character had long preceded the Foster invention, since at least the early 1920's, but was subject to spotty heating effects that produced discontinuous welding spots or beads which left the welded tube with spaced unwelded regions and stress-concentration weakened zones, which prohibited the use of such tubes in applications where they were required to pass fluids or the like or where they were to be pressurized.

9. This problem of "spotty" welding was sought to be solved over the years by numerous proposals, including: (A) lowering the speed of drawing of the tube past the electrodes, which greatly limited production speeds and still did not provide absolutely continuous welds;

(B) producing overlapping weld spots which again restricted the speed of formation of the welded tube, produced stress concentrations, and still left unwelded areas along the seams adjacent to the overlapped weld spots or beads; (C) varying the pressure of the pressing of the tube seam together during welding to increase the heating effect at the electrodes which, again, placed limitations on speed of formation and produced discontinuous welds despite such control; and (D) increasing the frequency of the alternating current applied to the electrodes to higher frequencies, which step by itself alone did not prove to effect high speed continuous welds.

10. It remained for Foster to conceive a radically new idea in alternating current welding that, as subsequently proven by the experience of defendants, and as correctly taught and predicted in the Foster patent, remarkably solved this longstanding welding problem that the art had tried such numerous methods of solving without substantial success. That revolutionary concept resided in preventing the alternating current applied to the electrodes contacting the seam edges of the tube to be welded, from just flowing transversely in the paths between the electrodes, and in forcing the same rather "to sweep or reciprocate the current stream back and forth through a space of predetermined length in the seam, thereby to cause the welding current stream to establish a welding action longitudinally along the seam, instead of making the spaced spot welds as in the prior practice" (Col. 4 of the Foster patent, line 64, on). By this forcing of the transverse current to flow longitudinally along the seam edges in front of the electrodes, the heating is not just confined to the opposite points at the electrodes, but there is effected a heat weld of a predetermined longitudinal portion of the seam edges that provides for a continuous and not a localized heated spot weld or bead.

11. The apparatus by which Foster proposed to effect this forcing of the

current, that would normally otherwise pass along transverse paths between the electrodes, so that it would move longitudinally along the V seam edges being joined and welded, was a magnetic core structure disposed within the tube being welded and disposed adjacent to the electrodes and the surfaces being welded, to set up an alternating magnetic flux field at the welding region adjacent to the welding current stream and, in the words of, for example, method claims 16 and 22 and apparatus claim 19 of the Foster patent, perpendicular or at right angles to the current stream to cause the same "to move" or "reciprocate" longitudinally along the seam edges in the region where they are becoming "progressively engaged". In the embodiment of Foster's Fig. 34, for example, the magnet 71 with its pole pieces pointing upward, and properly physically and angularly positioned with respect to the region of the electrodes and the V-shaped progressively engaged welding zone at seam 66, is disclosed for producing this effect.

12. While Foster illustrates a properly positioned and angularly oriented electromagnetic device 71 in his Fig. 34, the use of an electromagnet is clearly stated in the patent to be only "by way of example" (Col. 11, line 21); Foster interchangeably uses both the term "electromagnetic" and just "magnet" throughout the patent (Col. 11, lines 21 and 22, lines 26 and 33, for example); and the art at this time had long recognized that magnetic flux could be produced both by directly exciting a magnet, as an electromagnet, and by inductively exciting a magnet from an external current, and that magnetic control of currents is identically affected by magnetic flux whether such flux is produced by a directly excited electromagnet or by an induced magnet core.

13. Method claim 5 describes the invention similarly to method claim 16, except that it is somewhat broader in merely specifying the setting up of the alternating flux control that is "disposed physically and angularly relative to the current stream to establish an electrodynamic action between the control flux field and the flux field of the weld current to cause the current stream to reciprocate longitudinally of the seam in the region of the progressive contact".

14. While the Foster patent teaches that the use of higher frequencies alone cannot, in Foster's view, solve the continuous speed welding problem in and of itself, the patent does teach that when used with the proper internal magnetic core, properly positioned and oriented as above described, the Foster invention is useful with "multiple" or "higher frequency control".

### The Validity of the Foster Patent

15. The evidence upon which the defendants claim that the patent in suit is inoperative is the testimony of defendants' Vice-President Rudd. His testimony has been largely rejected by the Court because it was inconsistent in important particulars and lacked persuasiveness. Rudd's testimony was, in essence, that he did not think that the Foster device would work as described for reasons which rested upon statements in certain textbooks which he originally testified he himself had found.

16. On cross-examination, however, Mr. Rudd (a) conceded that the textbook statements did not in fact deal with the Foster patent equipment and operation, and, indeed, that it was others and not he who even found the textbook references, and he was not even able to interpret or explain those references to the Court; (b) conceded that though he and AMF could have made a test of the actual operativeness of the Foster patent system they deliberately did not do so; (c) ultimately conceded that the Foster system of Fig. 34 would operate after all, just as described, contrary to his testimony on direct examination; and (d) in fact, at an earlier date, before this litigation, Rudd demonstrated a thorough appreciation of the operativeness of the use of the appropriate magnetic

core to attain the desired results at both 60 cycles per second and at high radio frequencies, in his disclosure to his patent attorney of what he then thought was his own invention.

### The Patent in Suit Has Been Infringed by the Defendants

17. The ·defendants have manufactured and sold products similar to those disclosed in Figs. 1 through 4 of the Rudd and Stanton patent 2,833,910 and in Fig. 5 of Stanton and Rudd patent 2,818,488, within six years of the commencement of this action in the United States.

18. Each of the welding structures of Figs. 1 through 4 of patents 2,833,910 and 2,818,488, Plaintiff's Exs. 2 and 3, respectively, when operated in their intended manners, embodies every one of the method steps of Foster claims 5, 16 and 22 and the complete combination of elements set forth in Foster's apparatus claim 19.

19. The testimony of plaintiff Foster and the defendants' witness Rudd, and the statements of the Rudd and Stanton patents 2,818,488 and 2,833,910, Plaintiff's Exs. 2 and 3, all clearly show that the defendants' structures operate in substantially the same manner with substantially the same elements to attain the same results as described and claimed in the Foster patent in suit.

20. Though the magnet core employed in the defendants' structures is an induced magnet core, it produces the alternating magnetic flux required by the Foster claims to move the electric current longitudinally up and down the edges of the seam where they are being progressively engaged to produce Foster's claimed result in substantially the same way as does the illustrated Foster electromagnet core. The Foster magnet and the defendants' core are functional equivalents.

21. Further, though there may be additional advantages in the use of defendants' high radio frequencies, insofar as the Foster invention is concerned and the desirable results attained by his appropriately positioned angularly oriented magnetic core, the defendants' structures must and do utilize this invention to attain the very advantages sought and taught by the Foster patent.

22. While defendants have called attention to the Sessions patent 2,139,211, Defendants' Ex. C, for the sole purpose of indicating that defendants are not using the Foster invention, but are using something closer to the Sessions invention, it should be observed that the Patent Office allowed the Foster claims in full knowledge of this very Sessions patent (Col. 26, line 50 of Foster patent) so that the Foster claims were on their face granted for something over and above Sessions' invention. Since defendants' apparatus finds response in the Foster claims, such apparatus obviously embodies more than the Session patent discloses; particularly since the defendants concede that what Foster has patented "cannot be found in the prior art or held to be obvious in view of it" (page 7 of defendants' trial brief). As stated in the file wrapper of the Foster patent when the Examiner originally cited the Sessions patent, all that the particular type of core and its orientation could produce in the device of the Sessions patent was, in Foster's words

"preventing or reducing the by-pass current that flows around the back of the tube instead of across the seam, directly between the electrodes.

"Nowhere in the Sessions patent is there any suggestion of any appreciation of the problem and the solution which are treated in this application." (File Wrapper, p. 87, Defendants' Ex. A)

The Examiner agreed that this is all that the Sessions patent teaches and allowed claims for the Foster concept of forcing the otherwise transverse current to move longitudinally down the edges being progressively engaged for welding; and, as above stated, this is precisely what the type of core and its orientation and excitation achieves in the defendants' structures.

23. The advantages attained by the defendants' apparatus that are stressed in their literature are precisely those taught in the Foster patent: higher speed, elimination of spots and discontinuities, provision of continuous progressive weld with fine grain structure, no lines or regions of stress concentration, flexibility for use with both thin and thick metal pipes of different dimensions, and concentration of the welding current in the longitudinal edge region being joined.

### There Has Been No Forfeiture or Abandonment. Laches Has Not Been Proved

24. Foster filed a first application, Serial No. 311,557 for his invention on December 29, 1939, obtained allowance on December 8, 1941, and refrained from paying the final fee, whereupon that application became abandoned.

25. At the time he refrained from paying the final fee, Foster was in the employ of the United States Army Signal Corps during war time. While he appreciated the revolutionary nature of his invention, he was concerned about the adequacy of his application in terms of protecting the same. He had not at that time acquired either an electrical engineering degree or sufficient specialized technical information "to ascertain the correctness of the invention and its full scope and to educate [himself] to the extent that would enable [him] to ensure that all possible modifications and equivalents of this invention had been technically and properly covered in the application." In short, what he described as the "worth" or merit of the application, in this technical sense, was not then established; and though he tried to get information and assistance from military sources, he failed in this and concluded that he had "to go back to college and learn about design principles" for himself to insure this "correctness", "full scope" and proper coverage in the application. Foster acted in good faith and it is for this reason alone that he did not pay the final fee.

Foster has given credible testimony that "never, at any time did I abandon, or intend to abandon, the invention"; and "that there was nothing deliberate in my failure to pay final fee insofar as delaying the benefit of the invention to the public may be concerned. Further, there was no thought whatsoever to abandon my efforts to obtain proper patent protection for the said invention."

26. In accordance with his above-expressed intentions, Foster "thereupon immediately enrolled in the electrical engineering course in the evening school of George Washington University, in Washington, D. C., and continued there through 1945", transferring to the evening school in the engineering department of Polytechnic Institute in Brooklyn upon his transfer to New York through 1950, returning to George Washington University to receive his electrical engineering degree in 1951 and then continuing his graduate electrical engineering studies at the graduate school of the Polytechnic Institute until he obtained that "greatly deepened and widened insight into the operating problems in welding" that gave him the conviction he could file a new application for patent (Serial No. 399,942, filed December 23, 1953, which matured into the patent in suit) with the assurance that "all possible modifications and equivalents of this invention had been technically and properly covered".

27. A comparison of the first application and the second application demonstrates the additional claiming and greatly revised claims that this educational program had equipped Foster to effect.

28. The attention of the Commissioner of Patents was directed by Foster to the earlier application (in which the final fee had not been paid) when filing the later and second application. The Commissioner of Patents ruled that under the law and rules and regulations, the new application was legally proper and maintainable, and the Commissioner assigned the same a serial number, and permitted the old application patent

drawings to be used in the new case to save Foster expense.

29. In assigning a serial number, the Commissioner, acting under the law and rules, however, restricted Foster to the filing date of his new application, with the result that Foster, in the new examination of his new application, was made to assume the risk of another inventor having made his invention in the interim, a contingency which, had it occurred, would have defeated Foster's patent. The new examination revealed no intervening invention, and the patent issued with the new claims.

30. The earliest and uncorroborated date of disclosure by any of the defendants of a control core in a two-electrode alternating current welding system is March 3, 1954, several months after the filing date of the new application of Foster that matured into the patent in suit; and there is no evidence of any intervening invention by defendants or by others of such a combination before this Foster filing date.

31. There is no evidence that defendants or any of them relied on any delay by Foster or were lulled into any position to their prejudice, or materially changed their position as a result of any reliance upon any acts or omissions of Foster that could possibly give rise to the application of the doctrine of laches.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action. 28 U.S.C. § 1338(a). Jurisdiction over the parties and subject matter and venue are not in controversy.

2. Plaintiff, Julius E. Foster, is the owner of United States Patent No. 2,882,384.

3. United States Patent No. 2,882,384 is good and valid in law; and defendants have not sustained the burden of proving this issued patent to be invalid for alleged inoperativeness. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., D.C., 143 F.Supp. 429,

437-438, aff'd 247 F.2d 343 (2d Cir. 1957).

4. The Commissioner of Patents in accepting the new application that matured into the patent in suit and in ultimately issuing such patent, correctly ruled that there had been no abandonment or forfeiture, deliberate or otherwise, and that there were no intervening rights invalidating the same attendant upon Foster's failure to pay the final fee of the earlier application. 35 U.S.C. § 102; Gallagher and Weber v. Smith, 206 F.2d 939, 41 CCPA 734 (1953).

The following cases relied upon by defendants are distinguishable and inapplicable to the facts hereinabove set forth: Woodbridge v. United States, 263 U.S. 50, 56, 44 S.Ct. 45, 68 L.Ed. 159 (1923); Wirebounds Patents Co. v. Saranac Automatic Mach. Corp., 65 F.2d 904 (6th Cir.1933); Allinson Mfg. Co. v. Ideal Filter Co., 21 F.2d 22 (8th Cir.1927); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516, 520 (2d Cir.1946).

5. Defendants have not proved abandonment, forfeiture or the existence of intervening rights. To the contrary, plaintiff has adduced sufficient and persuasive evidence of the lack of same.

6. The defendants' Thermatool apparatus of the type similar to that shown and described in Fig. 5 of Rudd and Stanton Patent No. 2,818,488 and in Figs. 1-4 of Stanton and Rudd Patent No. 2,833,910 infringes each of claims 5, 16, 19 and 22 of Foster Patent No. 2,882,384.

7. It is not a prerequisite for a patent that its disclosure must have been built and operated; and where the patentee is not in the business, failure to spend large sums is not the proper basis for describing the patent as a "paper patent", particularly where it involves a revolutionary new concept. Baxter Laboratories, Inc. v. Corn Products Co., 394 F.2d 892 (7th Cir.1968).

8. Even if narrowly construed, however, each and every step and element of

Foster claims 5, 16, 19 and 22 finds response in terms, function and result in the defendants' Thermatool apparatus.

 9. Plaintiff is not barred by laches from maintaining this suit. Mere delay in bringing suit is not a sufficient basis for the invocation of this equitable doctrine.

10. Plaintiff is entitled to injunctive relief restraining the defendants, their agents, employees, and others under their control, from continuing the infringement of plaintiff's patent No. 2,882,384.

11. Plaintiff is entitled to an accounting to determine the damages by reason of defendants' infringement.

12. Plaintiff is entitled to costs and expenditures.

Submit proposed judgment on notice.