**Julius E. FOSTER, Plaintiff-Appellant,**

v.

**AMERICAN MACHINE & FOUNDRY CO. et al., Defendants-Appellees.**

**No. 230, Docket 73–1822.**

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1973.

Decided Feb. 21, 1974.

---

26. *People v. Berger,* 40 A.D.2d 192, 338 N.Y.S.2d 762 (3d Dep't 1972); *People v.* Boyce, 55 Misc.2d 53, 284 N.Y.S.2d 358 (Sup. Ct. Queens Co. 1967).

**1318**

Paul J. Foley, Washington, D. C. (Belen & Foley, Washington, D. C., Robert H. Rines, Rines & Rines, Boston, Mass. and Franklin R. Weissberg, Colton, Weissberg & Yamin, New York City of counsel), for plaintiff-appellant.

William K. Kerr, New York City (Fish & Neave, Herbert F. Schwartz, Raymond C. Marier and Frank H. Gordon, Rogers, Hoge & Hills, New York City of counsel), for defendants-appellees.

Before WATERMAN and FEINBERG, Circuit Judges, and GURFEIN,* District Judge.

* Of the United States District Court for the Southern District of New York, sitting by designation.

GURFEIN, District Judge:

This is an appeal from a judgment of the District Court, Palmieri, J., confirming the Report of the Special Master, Dana M. Raymond, which awarded the plaintiff reasonable royalties for the defendants' infringement of his patent in the amount of $344,000 with interest from the date of the filing of the Master's Report, which denied injunctive relief, and which ordered a compulsory licensing on a reasonable royalty fixed by the Court in lieu thereof. The issues of validity and infringement are not before us on this appeal, having previously been resolved in Foster v. Magnetic Heating Corporation, 297 F.Supp. 512 (S.D.N.Y.1968), aff'd per curiam, 410 F.2d 12 (2 Cir.), cert. denied, 396 U.S. 829, 90 S.Ct. 82, 24 L.Ed.2d 80 (1969) ("Foster I"). For the reasons set forth below, we affirm the judgment.

Since Judge Palmieri's opinion in *Foster I* explicated his findings that Foster's patent was valid and infringed, it is unnecessary to repeat those findings in detail. Some discussion of the facts is necessary, however, for an understanding of the question of the relief appealed from, including the proper measure of damages.

The appellant is the inventor of Patent No. 2,882,384 entitled "Welding System." This welding system is essentially an impeding device. "It relates to the progressive continuous welding of such items as sheet metal tubes with the aid of a pair of electrodes to which is applied an alternating current voltage for the purpose of supplying electric current for heating the edges of the tube to weld the same together in a continuous process as the sheet metal is folded into tubular form and drawn past the electrodes." (297 F.Supp. at 514). The Foster patent included "use" claims as well as "apparatus" claims. The utility of the invention is found in Judge Palmieri's description of the prior art and the teachings of the patent in suit: "Welding apparatus of this character had long preceded the Foster invention, since at least the early 1920's, but was subject to spotty heating effects that produced discontinuous welding spots or beads which left the welded tube with spaced unwelded regions and stress-concentration weakened zones, which prohibited the use of such tubes in applications where they were required to pass fluids or the like or where they were to be pressurized." 297 F.Supp. at 514.

The Foster patent relates to an improvement in electrical contact resistance welding, one of several systems for longitudinal welding of pipes and tubes, which was exemplified in the Foster patent by application to low frequency welding. The key feature of the Foster patent is the use of electromagnets, positioned in the vicinity of the welding zone, for the purpose of controlling or influencing the path of the welding current.

The appellant, Julius E. Foster, the patentee and the owner of the patent in suit, is a patent solicitor and a member of the Bar of the State of New York and of the Commonwealth of Pennsylvania. He has been at the Bar for almost fifty years. He has never engaged in any manufacturing or other business connected with the patent in suit.

The principal defendant and real party in interest is appellee American Machine & Foundry Co. (AMF). Infringement of the patent has occurred as a result of the commercial activity of AMF's wholly-owned subsidiary, AMF Thermatool, Inc., and its predecessors,[1] and the individual proprietors of such predecessor corporations (herein collectively referred to as Thermatool.) Thermatool manufactured welding machinery, which included *as a component* an impeder which embodied the process protected by Foster's patent.[2]

1. Which includes Magnetic Heating Corp.

2. Thermatool also manufactures and sells other welding systems which do not employ impeders and do not infringe the appellant's patent.

Thermatool in turn sold and leased the welding systems, both those containing the infringing impeder and those without it, to foreign and domestic mill producers for the production of longitudinally welded tubes and pipes.[3] The Master found that "the value of the impeder process, as disclosed in the Foster patent, constitutes a minor but significant fraction of the total value of Thermatool's welding technology."

## I

The primary issue on this appeal is the amount of damages to which Foster is entitled.

The Master and the District Court applied the willing licensor-willing licensee approach to hypothetical negotiations conducted in 1959–1961 between Foster, as a willing licensor, *and Thermatool,* as a "willing licensee who would respect the Foster patent." See Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2 Cir.), cert. denied, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). Based upon this approach, the Master concluded that "[t]he parties would have agreed upon a royalty measured by the output power of Thermatool's equipment adapted for use of the Foster impeder process" of $20 per kilowatt of rated output power of Thermatool's welding equipment, "such royalty to be paid for a license to Thermatool to continue its manufacture and sale of the equipment and for a license to Thermatool's customers to use the equipment." The District Court confirmed the report of the Master.[4]

On this formula, the District Court entered judgment for Foster in the sum of $344,000, with interest at 6% from September 22, 1972, the date of filing of the Special Master's Report.

 Foster appeals upon the ground that the judgment is grossly inadequate. He agrees that the proper measure of damages is a "reasonable royalty," but he contends that it should be based upon the extent of use of his "welding system" by the *mill operators* who leased the welding equipment containing the infringing impeder from Thermatool.

He says that Thermatool induced the infringement by the mill operators, and, hence, is an infringer within the meaning of 35 U.S.C. § 271(b). That subsection provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Arguing that Thermatool is an "inducer" rather than a direct infringer, appellant doubles back to 35 U.S.C. § 284 and says that appellant should be awarded "in no event less than a reasonable royalty for the use made of the invention by the infringer." If the infringer is the mill operator, he argues, then the "use of the invention" must be the use made by the mill operator and *that* use should measure the damages. He contends that damages so measured should be imposed upon the inducer, because under § 271(b) he is liable as if he were the infringer, and because he is, in any event, a joint tortfeasor, liable *in solido.*

The argument, which has some surface plausibility, is without merit.

The Patent Law was amended in 1946, to provide for the award of "damages" only; and not, as had previously been the case, for an accounting of the profits of the infringer. Act of August 1,

---

3. AMF has never manufactured or sold any low frequency electric resistance welding systems of the kind described in the Foster patent. Impeders, which were found to correspond in function to the electromagnets of Foster's patent, are found in some, but not all, of AMF's high frequency contact resistance longitudinal welding equipments.

4. The Master rejected AMF's contention that the royalty should be based on the "weld head" in Thermatool's equipment, because the Foster invention disclosed and claimed a "process" for improved welding, and not merely an "improved weld head." On AMF's theory, the royalty, at 2% of the aggregate sales price of the infringing weld heads, would have amounted to only about $10,500.

1946 c. 726 § 1, 60 Stat. 778, 35 U.S.C. (1946 ed.) §§ 67, 70.[5]

We have been instructed that "the present statutory rule is that only 'damages' may be recovered." Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964). As noted in *Aro Mfg. Co.*, damages are " 'compensation for the pecuniary loss he [the patentee] suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts.' Coupe v. Royer, 155 U.S. 565, 582, 15 S.Ct. 199, 39 L.Ed. 263." (377 U.S. at 507, 84 S.Ct. at 1543). Damages to the patentee constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Id.*, citing Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 552, 6 S.Ct. 934, 29 L.Ed. 954.[6]

If we ask ourselves how much Foster would have made if Thermatool had not infringed, the answer must be zero. But Congress was not satisfied to leave the award, in such case, at zero. 35 U.S.C. § 284.[7]

Since appellant would prove no damages at all under the tests noted in *Aro, supra,* because he was not in business either directly or through licensees, he is entitled *only* to the reasonable royalty for use of the invention.

Foster urges that a "reasonable royalty" for such use by the mill operators would result in a royalty of $52,000,000 from the sale of 77 "equipments" instead of the $344,000 that was awarded.

He notes that there are 69 tube mill operators who have produced $1,750,000,000 worth of longitudinally welded tube and pipe, employing the infringing Thermatool welding systems. Postulating a reasonable royalty of 3%, the appellant concludes that his damages amount to $52,000,000.

The Master found that "[s]uch damages would be in excess of the total revenues of Thermatool during the accounting period and far in excess of the revenues and profits of Thermatool in respect of its domestic sales of welding equipment." And the District Court agreed.

As indicated, the Master related the "reasonable royalty" theory to hypothetical negotiations between Foster and Thermatool, rather than between Foster and the 69 mill operators. He also disposed of the theory that such negotiations with the mill operators would have produced a greater royalty. Support for such theory would have to be found in a history evidencing willingness by the mill operators to pay a running, or throughput royalty, based on their production, for rights to the welding process. The Master found that the evidence was to the contrary, a finding confirmed by the District Court. We cannot say that the finding was clearly erroneous.

35 U.S.C. § 284 provides:

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use

5. In the 1952 Codification, §§ 67 and 70 of the 1946 Code were consolidated in the present § 284.

6. We note, in passing, that *Aro Mfg. Co., supra,* did not deal with an "active inducer" (§ 271(b)), but with a contributory infringer (271(c)), which Thermatool was not. We do not deal here with the question whether Foster could sue the 77 mill operators as direct infringers. And we do not have occasion to construe Mr. Justice Black's statement, dissenting in *Aro Mfg. Co., supra,* 377 U.S. at 523, 84 S.Ct. at 1551: "The Court holds, quite properly I think, that a patentee

can get only one recovery for one infringement, no matter how many different persons take part in the infringement."

7. The "reasonable royalty" concept was originally adopted by the courts in order to fix damages in the absence of an established royalty or to compensate a patentee unable to demonstrate any actual damage. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915). See Russell Box Co. v. Grant Paper Box Co., 203 F.2d 177 (1 Cir. 1953); Munger v. Perlman Rim Corp., 275 F. 21 (2 Cir. 1921).

made of the invention by the infringer, together with interest and costs as fixed by the court."

"This rule contemplates a suppositious meeting in advance of infringement between patent owner and potential infringer in order to work out a license agreement,"[8] Feinberg, J., in Georgia-Pacific Corp., *supra,* 446 F.2d at 296–297.

If we treat the mill operator as the infringer, there is no substantial evidence that he would have agreed to any royalty for the use of the infringing impeder at the "suppositious meeting." As Judge Palmieri held, there were two factors which operated to limit the damages of the plaintiff: "(1) [p]ipe and tubing manufacturers customarily do not pay running royalties to the owners of welding process patents; and (2) [p]laintiff's patent represents a relatively small portion of the overall commercial value of Thermatool's high frequency welding system. Since running royalties are not customary in the pipe and tubing industry, it is unlikely that any producer would have been willing to pay such royalties for the use of equipment that employed plaintiff's impeder." We agree. The question was what a reasonable man would be willing to pay for the use of a part of the whole process. Merrell Soule Co. v. Powdered Milk Co. of America, 7 F.2d 297, 299 (2 Cir. 1925).

A portion of the lump-sum sale price of the Thermatool equipment in its entirety may be said to have been paid for the Foster process, even though the customer was not charged a separate fee; but that is the very basis on which the District Court determined the reasonable royalty, noting that "plaintiff's impeder had a relatively small effect on the commercial value of defendants' high frequency welding system. . . ."

In practical terms, Foster had a patent which obviously required the manufacture of a piece of equipment to make it usable. Foster does not have any licensee who manufactures his patented apparatus or uses his patented process. The parameters of his patent embraced a component in a larger system which utilized his process. He did not have equipment to sell directly to the mill operators. He was hardly in a position to work out an agreement directly with the mill operators. His theoretical licensee, in the formulation of a license agreement, was the manufacturer of the welding equipment who could use his process. And it is precisely in hypothetical negotiation with that prospective licensee that the District Court fixed the reasonable royalty.

Finally, we note that there are no other factors that would have been considered at the "suppositious meeting" to determine the reasonable royalty. Since Foster never operated commercially, there are no such factors as Foster's marketing program, Foster's lost sales of non-patented items because of the infringement, or Foster's lost profits.

Appellant contends that even upon the theory of a reasonable royalty based on appellees' sales, the $20 per kilowatt royalty found by the District Court is a finding that is clearly erroneous. The total royalty awarded in the sum of $344,000 represents more than 3 per cent of the total sales price of the welding systems sold by Thermatool. These welding systems, including the step of turning the sheet metal into tubing, except for the use of the impeder, were found by the Master to be based on the teaching of the Park Patent No. 2,794,108, filed August 31, 1953, and issued May 28, 1957, owned by AMF. The Master found that "the Park patent disclosed and claimed the process and

8. We think the Master properly expressed the concept when he presumed that in the "negotiations" prudent businessmen would arrive at a reasonable royalty "which would (1) provide a fair return to Foster and (2) permit Thermatool to continue its use of the infringing impeder process and earn a reasonable profit from such use."

system for high frequency contact resistance welding of longitudinal seamed tubing for which all of Thermatool's welding systems involved in this accounting have been designed." The impeder is only a part of the entire high frequency contact resistance welding equipment sold by Thermatool and an even smaller part of the entire welding complex. Significantly, the Foster impeder process is not used commercially in any electrical resistance welding systems at low frequencies, although such use was also disclosed in the Foster patent.

■ The royalty awarded of $20 per kilowatt is 10% of $200, an amount which the Master found Thermatool to have charged its customers "for the right to use Thermatool's welding technology (know-how and patents) and for services in connection therewith." The $20 per kilowatt royalty for the Foster impeder process properly took into account, we think, that the Foster process was "an improvement or supplement to Thermatool's high frequency process, rather than *vice versa*," and that "the selling price of Thermatool's equipment is accounted for in major part by the high frequency generator as to which Foster contributed nothing." We cannot say that the finding that "[t]he parties would have agreed on a royalty at a rate of $20 per kilowatt on all infringing equipment sold for use in the United States after April 14, 1959" was clearly erroneous. See Columbia Machine & S. Corp. v. Adriance Machine Works, 79 F.2d 16 (2 Cir. 1935). "There is no mathematical formula for the determination of a reasonable royalty." See Faulkner v. Gibbs, 199 F.2d 635, 639 (9 Cir. 1952).

In sum, we affirm the award of damages by the District Court.

9. Although these units were sold before the Foster patent issued, their impeder process relied on the Rudd 488 patent, owned by appellee, which is the same in all material respects as the impeder process disclosed in

II

Appellant contends that appellee failed to account for an additional 37 units which should have been, but were not, included in the Master's determination of the royalties to be awarded. On the royalty formula adopted by the Master and approved by the Court, this would require an additional maximum recovery of $37,000.

Twenty-six of these units were sold before April 14, 1959, the issue date of the Foster patent. Eleven of these units were allegedly sold after the issue date.[9]

■ With respect to the units sold *before* the issue date of the Foster patent, the sale could not have been, at the time, an infringement, or an inducement to infringe. Coakwell v. United States, 372 F.2d 508, 511, 178 Ct.Cl. 654 (1967). The units sold were Thermatool's infringing units. We think that the continued use of the welding systems by the mill operators after the flat payment for the systems when bought, did not later constitute an infringement of the after-issued Foster patent. See Aluminum Extrusion Co. v. Soule Steel Co., 260 F. Supp. 221, 224 (C.D.Cal.1966). All the revenues from these sales were derived by AMF before the Foster patent issued.

Since Foster has shown no actual damage, we revert to the "suppositious meeting" after the Foster patent issued, to fix a royalty. We agree with Judge Palmieri "that the parties would have agreed that no royalty would be payable with respect to infringing equipment sold prior to the issuance of plaintiff's patent."

With respect to the eleven units allegedly sold after the issue of the Foster patent, the Master found that "the evidence does not establish that such eleven units have actually been fitted with impeders and operated in the United States

the *earlier filed* Foster patent. (See *Foster I*, 297 F.Supp. 512 (Palmieri, J.)). The Rudd patent has been held to be the subservient patent.

for the production of longitudinally welded tube and pipe." The appellant points to no evidence to convince us that the finding is clearly erroneous.

### III

Judge Palmieri, as we have seen, awarded interest on the sum awarded from September 22, 1972, the date of filing of the Special Master's Report to the date of judgment. Appellant contends that, since the award was based on a hypothetical license entered into immediately upon the issuance of his patent, he is entitled to interest on the royalties that should have been paid from that time to judgment. He says that the interest should run equitably on the outstanding infringing sales of each year from the end of each such year.

■■ We think that under prior authority in this Court, appellant's argument cannot prevail as a matter of law. In Georgia-Pacific Corp., *supra,* this Court resolved the issue of statutory construction. This Court noted that while the 1946 House Report [10] provided for "interest from the time the infringement occurred," the final version of 35 U.S.C. § 284 speaks of "interest and costs as fixed by the court." It was held, accordingly, that "Congress did not purport to require interest from the dates on which royalties would normally have been paid." 446 F.2d at 301. Instead, the statute was construed to mean that the trial court has the traditional discretionary power in equity to award interest. We cannot find, in the absence of a statutory mandate, that Judge Palmieri was required to award interest from an earlier date. See also General Electric Company v. Sciaky Bros., Inc., 415 F.2d 1068, 1076 (6 Cir. 1969).

### IV

Appellant contends that the District Court erred in denying an injunction and adjudging, in lieu thereof, a compulsory licensing in favor of appellant at the royalty fixed by the Court.

■■ We do not find any difficulty in agreeing with Judge Palmieri that an injunction would be an inappropriate remedy in this case. An injunction to protect a patent against infringement, like any other injunction, is an equitable remedy to be determined by the circumstances. 35 U.S.C. § 283. It is not intended as a club to be wielded by a patentee to enhance his negotiating stance. See Hoe. v. Boston Daily Advertiser Corp., 14 F. 914 (C.C.Mass.1883). Here, as the District Court noted, the appellee manufactures a product; the appellant does not. In the assessment of relative equities, the court could properly conclude that to impose irreparable hardship on the infringer by injunction, without any concomitant benefit to the patentee, would be inequitable. Nerney v. New York, N. H. & H. R. Co., 83 F.2d 409, 410–411 (2 Cir. 1936); American Safety Device Co. v. Kurland Chemical Co., 68 F.2d 734 (2 Cir. 1934).

Instead, the District Court avoided ordering a cessation of business to the benefit of neither party by compensating appellant in the form of a compulsory license with royalties. This Court has approved such a "flexible approach" in patent litigation. Royal-McBee Corp. v. Smith-Corona Marchant, Inc., 295 F. 2d 1, 6 (2 Cir. 1961). Here the compulsory license is a benefit to the patentee who has been unable to prevail in his quest for injunctive relief. To grant him a compulsory royalty is to give him half a loaf. In the circumstance of his utter failure to exploit the patent on his own, that seems fair.

Judgment affirmed.

---

10. H.R.Rep.No.1587, 79th Cong. 2d Sess. (1946), to accompany H.R. 5311 at 1–2 quoted in *Aro, supra,* 377 U.S. at 505–506, 84 S.Ct. 1526, 12 L.Ed.2d 457.